**THERMO ELECTRON CORPORATION,**
Plaintiff, Appellee,

v.

**SCHIAVONE CONSTRUCTION
COMPANY, et al., Defendants,
Appellants.**

No. 90–1179.

United States Court of Appeals,
First Circuit.

Heard July 30, 1990.
Decided Oct. 2, 1990.

Gael Mahony with whom Bruce E. Falby, Stephanie S. Lovell, Christopher Patusky, Hill & Barlow, Toni G. Wolfman and Foley, Hoag & Eliot, Boston, Mass. were on brief, for defendants, appellants.

Tracy A. Miner with whom Gail C. Bernstein and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Mass., were on brief, for plaintiff, appellee.

Before CAMPBELL and TORRUELLA, Circuit Judges, and RE,[*] Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Schuyler Investments Corporation ("Schuyler"), Schuyler Long Beach Incinerator Company, Incorporated ("Schuyler Long Beach"), and Schiavone Construction Company ("Schiavone") appeal from the judgment of the district court in an action for breach of contract brought against them by Thermo Electron Corporation ("Thermo"). The district court, following a bench trial, responded summarily to several questions the parties formulated at its request, and then found in favor of the plaintiff on its claims for breach of contract and fraud, and against the defendants on their counterclaim for breach of contract. The plaintiff was awarded damages in the amount of $1,850,000. Because the court's responses to the questions and its ultimate rulings fell short of compliance with Fed.R. Civ.P. 52(a), we remand for additional proceedings.[1]

## I. BACKGROUND

The following appears from the appellate briefs and record:

1) In 1982, Schuyler Investments, a New Jersey corporation engaged in real estate financing, initiated the development of a facility in Long Beach, New York which would generate electricity by incinerating the city's trash. In March 1983, Schuyler organized Schuyler Long Beach, a New York corporation and a wholly-owned subsidiary of Schuyler, to manage the development and operation of the incinerator project. As a result of its inability to obtain project-based financing, Schuyler sought a financial partner, and, in July 1984, formed the S & S joint venture ("S & S") with Schiavone, a New Jersey corporation engaged in heavy construction.

---

[*] The Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation.

1. Fed.R.Civ.P. 52(a) provides, in part, as follows:

> In all actions tried upon the facts without a jury ..., the court shall find the facts specially and state separately its conclusions of law thereon, ...

2) By the latter part of 1985, S & S had completed several of the necessary steps toward developing the project including, *inter alia*, obtaining financing, securing the necessary air quality and construction permits from the New York Department of Environmental Conservation ("DEC"), executing a lease for the facility site with the City of Long Beach, and securing contracts for the supply of nonmunicipal solid waste and for the sale of the energy generated by the project to Long Island Lighting Company.

3) In the summer of 1985, before construction began on the project, Schiavone decided to sell its interest in the joint venture. In December of 1985, Robert Nordstrom, Thermo's Vice President for Marketing, contacted Schiavone's president, Joseph DiCarolis, and they began to discuss the possibility of Thermo's acquisition of Schiavone's interest.

4) In January 1986, Schuyler Long Beach, having also decided to sell its interest in the project, entered into the ongoing discussion between Thermo and Schiavone.

5) Pursuant to these discussions, the parties drafted and signed a letter agreement dated January 27, 1986. This agreement provided for the two-step acquisition of the project by Thermo, subject to a number of conditions. Thermo agreed to pay S & S $1 million upon satisfaction of seven conditions, among them the confirmation of the assignability of S & S's rights in the project, including the DEC permits, and the remaining $900,000 upon the satisfaction of five additional conditions, including Thermo's obtaining a letter of credit to replace the letter of credit guaranteed by Schiavone. The agreement established no closing date nor did it establish a timetable for the satisfaction of these conditions. The letter agreement did anticipate the development of more complete documentation of the terms of the agreement in connection with the closing of the deal.

6) Following the signing of the letter agreement, the parties exchanged drafts of a purchase agreement; however, they were unable to agree on several of the terms proposed by Thermo. Specifically, the closing documents drafted by Thermo conditioned Thermo's obligation to purchase the project on its ability to obtain project-based financing and on its ability to use alternative combustion technologies. The drafts also gave Thermo the right to terminate the Purchase Agreement for any reason.

7) A problem arose concerning the assignability of the permits. These permits were particularly valuable because they were exempt from post–1983 regulations requiring costly scrubber equipment. Although S & S told Thermo that it believed that the permits were transferable, Thermo wished to confirm the assignability with DEC. At a meeting on March 5, 1986, the DEC informed Thermo that the permits were not transferable. It suggested, however, that Thermo could circumvent this restriction by acquiring the Schuyler subsidiary that held the permits. Instead, Thermo suggested that Schuyler, the holder of the permits, remain nominally in the project until the completion of construction at which time the permits would no longer be necessary. The parties orally agreed upon this new arrangement, and documents reflecting the agreement were to be drafted by Thermo's lawyers.

8) Allegedly because of increasing time pressure related to the expiration of the permits and in light of the problems with the Thermo deal, S & S began negotiations for the sale of the project to a third party, Montenay. When negotiations with Thermo broke down on March 24th, S & S decided to sell to Montenay. S & S proceeded with minor demolition at the site to obtain a thirty day extension of the DEC permits and completed the sale to Montenay in April. Montenay circumvented the non-assignability of the permits by acquiring the Schuyler subsidiary that held the permits. Montenay continued construction at the site for eight months and then sold the project to Catalyst, Incorporated, for a profit of $1.85 million.

## II. THE SUIT

Thermo initiated a breach of contract action against S & S in the district court seeking damages in the amount of its lost

profit and for alleged fraud on the part of S & S. S & S filed a counterclaim against Thermo for breach of contract.

The case came to trial on September 19, 1988. By agreement of the parties, the matter was tried to the court. The dispute focused on the January 27th letter agreement and the subsequent efforts of S & S and Thermo to close the deal. Thermo argued that, because no time for performance was agreed upon by the parties, time was not of the essence in the contract. Moreover, S & S was on notice that Thermo intended to explore the use of combustion technology other than that contemplated by S & S and that it planned to seek project-based financing, both of which would take time. Thermo argued that, in light of these considerations, it had made reasonable efforts to effect the purchase of the project, including pursuing financing, conducting engineering studies, drafting closing documents and exploring options to circumvent the permit transfer problem. Thermo contends that it was working toward closing the deal when S & S, in breach of the contract, sold the project to Montenay.

In addition to its breach of contract claim, Thermo contended that S & S was guilty of fraudulent misrepresentation with respect to the transferability of the permits, its failure to disclose the existence of the operating agreement with Montenay and, finally, its failure to notify Thermo when it began to negotiate with Montenay regarding the sale of the project.

S & S made several responses in response to Thermo's claims. First, S & S suggested that Thermo had repudiated or abandoned the January 27th letter agreement by demanding material conditions beyond those contemplated by the agreement. Moreover, S & S noted that Thermo's suggestion that Schuyler remain in the project through the construction phase differed substantially from that originally agreed upon by the parties. S & S claimed that, by demanding performance that would exceed the scope of the original contract, Thermo had repudiated or abandoned the January letter agreement. Thermo argued

that it never insisted on these conditions; rather, the changes were merely suggested modifications of the original agreement.

Second, S & S contended that, even if Thermo did not abandon or repudiate the letter agreement, it had breached the contract by unreasonably delaying performance. S & S noted that, although the agreement set no date for closing, both parties understood that the permits would expire on March 31, 1986; therefore, the end of March was the latest reasonable time for Thermo to purchase the project. More specifically, S & S argued that Thermo's failure to indicate within a reasonable time its satisfaction concerning the transferability of the permits caused one of the conditions precedent to the contract to fail, thus relieving S & S of its obligation to perform.

Finally, with respect to the misrepresentation claim, S & S argued at trial that Thermo never relied on its representation regarding the transferability of the permits. Indeed, the agreement specifically provided that Thermo would confirm the transferability of the permits with DEC. Furthermore, S & S argued that its failure to disclose both the existence of the operating agreement with Montenay and its early negotiations with Montenay for the sale of the project was not material and therefore did not constitute fraud.

At the close of the trial, the district court requested that the parties submit a brief series of questions summarizing the factual and legal issues raised. In lieu of findings and rulings or an opinion, the district court thereafter answered these questions summarily without stating the facts on which its conclusions rested. The court found for the plaintiff on both its breach of contract and fraud claims, against defendants on their counterclaims, and awarded damages to Thermo in the amount of $1.85 million.

## III. ANALYSIS

On appeal, Thermo contends that the court's answers to the parties' questions, coupled with its ultimate disposition of the claims and counterclaim, amounted to suffi-

cient findings to permit appellate review, and that these are supported by the record and not clearly erroneous. It argues further that the award of $1.85 million for lost profits is supported by the evidence and should be upheld.

S & S argues, to the contrary, that the district court's terse responses to the parties' questions, and its ultimate conclusions, clearly do not comport with the direction in Fed.R.Civ.P. 52(a) that the court "shall find the facts specially." Alternatively, it maintains that the liability determinations of the district court are unsupported in the record and should be reversed as clearly erroneous. It also complains that the damages award is unsupported.

We agree with appellants that the court's "Yes" or "No" responses to several questions do not amount to the findings called for by the Rule. Moreover, this is not the kind of simple case where failure to follow the Rule was harmless. This litigation requires analysis of a complex mixture of facts and legal standards. Appellant is entitled to know the version of facts found by the district court in order to formulate a meaningful appellate position. This court is similarly entitled to know the fact basis on which the district court proceeded. As we have noted, when the district court furnishes "only conclusory findings, unsupported by subsidiary findings or by explication of the court's reasoning with respect to the relevant facts, a reviewing court simply is unable to determine whether or not those findings are clearly erroneous." *Pearson v. Fair*, 808 F.2d 163, 166 n. 2 (1st Cir.1986).

The directive in Federal Rule of Civil Procedure 52(a) that the court, "shall find the facts specially and state separately its conclusions of law thereon" plainly contemplates more than that a court state only its ultimate conclusions as to the key issues, as was at most done here. On the principal factual issues, the court must make specific findings. *See Lyles v. United States*, 759 F.2d 941, 944 (D.C.Cir.1985); *see also Commissioner v. Duberstein*, 363 U.S. 278, 292, 80 S.Ct. 1190, 1201, 4 L.Ed.2d 1218 (1959) (noting that "unelaborated find-ing of ultimate fact here cannot stand as a fulfillment of [Rule 52(a) ]"). While district courts have wide leeway in determining what facts to include, and while we would not second-guess any reasonable application of the Rule's mandate, the court's disposition here plainly falls far short of finding the facts specially as the Rule requires.

The district court found without specific factual reference that the agreement between the parties was the January letter agreement and that it had not been modified. It further found, again without factual reference, that S & S had breached that agreement as well as its covenant of good faith and fair dealing. With respect to Thermo's fraud claims, the district court found that S & S had both misrepresented and failed to disclose material facts; however, it did not specify whether it was referring to misrepresentation regarding the permits, failure to disclose the existence of the operating agreement with Montenay, or the failure to disclose negotiations with Montenay. Finally, the court awarded damages to Thermo in the amount of $1,850,000, the amount of the profit realized by Montenay, without stating the factual basis for this award.

## IV. CONCLUSION

Until the district court makes the findings of fact called for under the Rule, appellant is unfairly deprived of an opportunity to pursue a meaningful appeal. Accordingly, *we vacate the judgment and remand* the case to the district court with instructions to find the facts specially, and to state separately its conclusions of law thereon, as required by Rule 52(a). In so ordering, we do not determine the merits of this appeal and we leave the court free to alter or maintain its ultimate resolution of the case as it believes proper.

We direct that the case go back to the same district judge. It can be argued that a remand to the original judge weakens the purpose of the Rule that a judge only decide after performing the useful exercise of finding the requisite facts; it can be argued that, by now, the judge's mind is made up. However, to require that a new

judge handle the case would burden the appellee with the expense of a new trial even though, for all we can tell, the case has already been correctly tried and decided. We think the district court's failure to follow Fed.R.Civ.P. 52(a) can best be rectified by insisting that appellants promptly receive the findings to which, under the Rule, they are entitled, but without imposing the burden of retrial. To ensure proper expedition, we direct the district court to render its Rule 52(a) findings and rulings and to enter a new judgment within at least three months from the date that mandate issues.

*So ordered. The parties shall bear their own costs.*