**THERMO ELECTRON CORP.,**
Plaintiff, Appellee,

v.

**SCHIAVONE CONSTRUCTION COMPANY, et al., Defendants, Appellants.**

No. 91–1193.

United States Court of Appeals, First Circuit.

Heard Oct. 9, 1991.

Decided March 12, 1992.

Gael Mahony, with whom Bruce E. Falby, Christopher Patusky, Hill & Barlow, Toni G. Wolfman, and Foley, Hoag & Eliot, Boston, Mass., were on brief for defendants, appellants.

Tracy A. Miner, with whom Joseph P. Crawford–Kelly and Mintz, Levin, Cohn,

Ferris, Glovsky and Popeo, P.C., Boston, Mass., were on brief for plaintiff, appellee.

Before BREYER, Chief Judge, CAMPBELL, Circuit Judge, and ZOBEL,[*] District Judge.

BREYER, Chief Judge.

For the second time, Schiavone Construction Company, Schuyler Long Beach Incinerator Company, and Schuyler Investments Corporation appeal a district court determination that they broke a contract with Thermo Electron Corporation, resulting in a judgment of $1.85 million in Thermo's favor. Initially, the district court, after a bench trial, communicated its findings by means of a series of "yes" or "no" answers to questions submitted by the parties. On appeal, this court held that those answers did not adequately explain the district court's findings and conclusions. *Thermo Electron Corp. v. Schiavone Construction Co.*, 915 F.2d 770, 773 (1st Cir.1990); Fed. R.Civ.P. 52(a) (in actions tried without jury, "court shall find the facts specially and state separately its conclusions of law thereon"). We returned the case to the district court.

Subsequently, the district court wrote a succinct explanatory opinion reaffirming its original conclusions. This appeal followed. After reviewing the district court's opinion, its findings, and the evidence in the record, we now conclude that the evidence adequately supports the district court's findings, and we affirm its judgment.

I

*Background*

A. *Basic Facts.* This court's first opinion set forth the basic background facts. *See Thermo Electron*, 915 F.2d at 770–71. To recapitulate: In the early 1980s, Schuyler Investments, through its subsidiary Schuyler Long Beach, set out to build a plant that would generate electricity by incinerating garbage. In 1984, Schuyler Investments formed a joint venture, the S & S Incinerator Joint Venture, with a finan-

cial partner, Schiavone Construction. (In this opinion, for ease of exposition, we shall sometimes refer to both the S & S venture and to its principals as "S & S." In fact, Schiavone owned 82.5% of the S & S joint venture; Schuyler Investments owned 17.-5%.)

By the end of 1985, S & S had obtained a lease for the site from the City of Long Beach, had negotiated contracts to buy garbage and to sell electricity, had obtained important air quality and building permits from New York's Department of Environmental Conservation, and had arranged with the New York Chemical Bank for a necessary letter of credit, secured by Schiavone's repayment guarantee. S & S then decided to sell the project.

On January 28, 1986, S & S signed an agreement promising to sell the project to Thermo for $1 million. The agreement basically provided that Thermo would pay $100,000 once S & S fulfilled seven conditions, one of which was to confirm that S & S could assign its air quality and construction permits to Thermo. Thermo was to pay an additional $900,000 once S & S satisfied five other conditions, including the actual assignment of the permits to Thermo. The agreement anticipated that the parties would negotiate details later.

During the next two months, the parties negotiated. They found that S & S could not arrange for *automatic* transfer of the permits, so they considered alternative ways to achieve the same result. Thermo wrote detailed drafts of purchase agreements, which would have changed key items in the January letter contract. S & S rejected the changes. S & S became impatient. It knew that its permits would expire at the end of March and that new permits would mean more expense. In mid-March, S & S began to negotiate with another company, Montenay International. It sold the project to Montenay in mid-May. Thermo then sued S & S for breach of contract (and made other claims not relevant here).

[*] Of the District of Massachusetts, sitting by designation.

B. *Questions.* The district court, in considering Thermo's claims, had to decide three fact-based questions:

1. Did Thermo (in February and March) break its January 1986 letter contract with S & S by a) repudiating the contract, or b) failing to provide assurances of compliance within a reasonable time?

2. If Thermo did not break the January letter contract, did S & S break that contract by selling the project to Montenay?

3. If Thermo did not break the January letter contract, but S & S did break that contract, what damages does S & S owe Thermo?

C. *The District Court's Answers.* In its opinion on remand, the district court answered the first, and most important, of these questions as follows: After January 28, the parties continued to negotiate. Thermo submitted drafts with terms that deviated significantly from the January contract terms, but both parties had suggested changes, and Thermo's suggestions did not amount to a "repudiation" of the contract. In early March, Thermo learned that the Department of Environmental Conservation could not transfer the necessary permits directly; Thermo still "did not repudiate the agreement, but rather contacted S & S to explore ways to handle the transfer prohibition." In mid-March, S & S demanded that Thermo close the deal by March 25. Thermo did not do so. Instead it sent S & S another draft. That draft deviated from the January agreement in important ways, but it also helped to meet the "assignability [of the permits] problem" by keeping Schuyler (the holder of the permits) on as part owner of the project for one year (with payment for its 17.5% interest coming at the end of that year, when construction would be complete and the permits no longer necessary). At the end of March, Thermo "reiterated its desire to move forward and indicated its willingness" to put its draft proposal "into effect" with several changes. Thermo's behavior, viewed as a whole, did not amount to a "repudiation" or "abandonment" of the contract by Thermo, nor did it amount to a

failure by Thermo to implement the January agreement within a "reasonable time."

The district court answered the second question by finding that at the end of March, S & S "told Thermo that it intended to make a deal with Montenay." On April 22, "S & S signed a contract to sell the project to Montenay." On May 19, S & S and Montenay "closed the sale." By taking these actions, S & S breached the January agreement with Thermo.

The district court answered the third question by finding that "Montenay, within seven months of buying the project from S & S sold it for a net profit of $1,850,000." The court found that Thermo therefore "suffered indisputable lost profit damages of $1,850,000 as a result of S & S's breach." It rejected Thermo's other damage claims "as too speculative."

The court entered judgment for Thermo on its breach of contract claim and awarded it damages of $1,850,000. S & S appeals.

## II

### *Threshold Arguments*

S & S argues at the outset of this appeal that the district court's opinion on remand does not sufficiently explain the basis for its conclusions. In our view, however, the opinion meets the requirement of Rule 52(a) that the court, trying a case without a jury, "shall find the facts specially." Fed. R.Civ.P. 52(a). This rule is intended in part "to aid the appellate court by affording it a clear understanding of the ground or basis of the decision of the trial court," 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2571, at 679 (1971) (citing cases), for "conclusory findings, unsupported by subsidiary findings or by an explication of the court's reasoning with respect to the relevant facts" leave a reviewing court "unable to determine whether or not those findings are clearly erroneous." *Lyles v. United States,* 759 F.2d 941, 944 (D.C.Cir.1985) (citing cases). Although a district court's opinion should not simply state conclusions where circumstances require more detail, we have also previously said that a trial judge

need only make brief, definite, pertinent findings and conclusions upon a contested matter, and there is no necessity for over-elaboration of detail or particularization of facts.

*McLaughlin v. Hogar San Jose, Inc.*, 865 F.2d 12, 14 (1st Cir.1989) (citations omitted); *accord* Fed.R.Civ.P. 52, advisory committee's note to 1946 Amendment. In our earlier opinion, we recognized the "wide leeway" the district court possessed in "determining what facts to include," and we added that "we would not second-guess any reasonable application of the Rule's mandate." *Thermo Electron*, 915 F.2d at 773.

Ultimately, the balance between too much detail and too little calls for an exercise of judgment by the district court. In our view, the district court's opinion on remand permits us adequately to understand the basis for its decision. It therefore satisfies both Rule 52 and our earlier holding. *See Applewood Landscape & Nursery Co. v. Hollingsworth*, 884 F.2d 1502, 1503 (1st Cir.1989) (" 'findings are sufficient if they permit a clear understanding of the basis for the decision' ") (quoting *Tri–Tron International v. Velto*, 525 F.2d 432, 435–36 (9th Cir.1975)).

■ Appellants also argue that, in light of our previous remand, the district court's "factual rulings in the present case require special scrutiny." We are aware of no such rule, however, and we can find no basis for such heightened scrutiny. Our previous opinion did not suggest the district court's findings were wrong; this court simply wanted to know what they were. This court did not "determine the merits of [the] appeal;" we left the district court "free to alter or maintain its ultimate resolution of the case as it believes proper." *Thermo Electron*, 915 F.2d at 773. This court nowhere suggested holding the district court to any "special" standard. *Cf. Anderson v. Bessemer City*, 470 U.S. 564, 571–73, 105 S.Ct. 1504, 1510–11, 84 L.Ed.2d 518 (1985) (rejecting heightened standard of scrutiny even where district court adopts proposed findings of one party).

■ Whether or not S & S breached the January contract is a mixed question of law and fact. *See Curley v. Mobil Oil Corp.*, 860 F.2d 1129, 1132 (1st Cir.1988). In the circumstances before us, the determinative legal question is whether the three sets of findings set forth above, p. 1160, *supra*, are "clearly erroneous." *See* Fed.R.Civ.P. 52(a) ("[f]indings of fact ... shall not be set aside unless clearly erroneous"); *Curley*, 860 F.2d at 1132 (clearly erroneous standard of review of contract-related mixed questions of law and fact) (citing cases). After reviewing the record, we conclude that the questions involved are, as an initial matter, close ones. But, for that very reason, as we explain below, we cannot say that the district court's resolution of those questions was "clearly erroneous." *See Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511.

### III

### *Breach of Contract*

■ A. *The Key Facts.* The parties agree that in late January 1986 they entered into a contract under which S & S would sell its interest in the project to Thermo. They also agree that S & S later sold its interest to a third party, Montenay, rather than to Thermo. The basic question is whether, in doing so, S & S broke its January promise to sell that interest to Thermo, or whether S & S was free to sell to Montenay because Thermo had already broken (or repudiated) the contract. The record indicates the following key events:

*January 28, 1986.* S & S and Thermo agree in writing that S & S will sell its interest to Thermo for $1 million. The agreement (which we have reproduced in an Appendix) says that Thermo will pay S & S $100,000 when seven "events" (listed in paragraph A of the agreement) are "complet[ed]." One of these events is that the "assignability of all S & S's 'Rights' has been confirmed to [Thermo's] satisfaction." ¶ A1. Another is that S & S "has provided [Thermo] with a letter stating" that it knows of no restriction in those "Rights" that would

prevent Thermo from processing 200 tons of garbage per day, it being "understood that [Thermo] is currently exploring other mass burn combustion technologies" and may use a combustion technology other than the "technology originally contemplated by S & S." ¶ A7.

Thermo will pay S & S an additional $900,000 upon the "completion" of five other "events" (listed in paragraph B). Paragraph B3 sets forth one of those five events as follows:

A substitute letter of credit has been provided by [Thermo] to replace the Schiavone letter of credit backing the [Chemical Bank] financing.

In this regard, it is understood that [Thermo] is seeking a substitute letter of credit which will be supported with project credits as opposed to the corporate credit of [Thermo].

*February 19.* Thermo sends S & S a detailed draft of a "purchase agreement." This draft, contrary to the January contract, gives Thermo the "right to terminate this Agreement for any reason," but the draft immediately adds that, in such a case, S & S "shall retain the $100,000 deposit as full and complete liquidated damages." · The draft also says that, on the closing date, Thermo

shall have obtained a project financing letter of credit, on terms reasonably acceptable to the Buyer, relying upon the Project cash flow instead of Buyer's balance sheets as a basis for Buyer's credit approval to replace the irrevocable letter of credit of Chemical Bank securing certain payments....

(The January contract required Thermo to buy the project *whether or not* it found "project based" financing.) Finally, the draft says that, before closing, "[a]ll permits and approvals" needed to build the facility *as planned by Buyer* shall have issued" (emphasis added). (The January contract required Thermo to buy the project *whether or not* it obtained approval for its own, different technology.)

*March 3.* The parties meet and discuss various changes in the draft. S & S does not agree that Thermo should have

the right to call off the agreement a) at Thermo's option, or b) if Thermo could not find "project based" financing, or c) if Thermo could not obtain approval for its own, alternative, technology. At the close of the meeting, Thermo agrees to incorporate the changes discussed and to prepare a new draft purchase agreement. The parties also discuss a "time frame" for a closing, though S & S apparently emphasizes that "[w]e don't care when the closing is, we want a commitment."

*March 5.* Three important events occur: First, Thermo sends S & S a new draft. The draft still permits Thermo to "terminate this Agreement at any time," giving S & S the right to keep the $100,000 as "liquidated damages" should Thermo withdraw because it cannot find "project based" financing. The draft also says, however, that if Thermo withdraws for any other reason, S & S can keep the $100,000 *and* an unspecified (presumably, to be negotiated) amount of damages ("and Buyer shall pay to Sellers in addition to [the $100,000] deposit the sum of $ _____ as full and complete liquidated damages"). It also retains the two other objectionable clauses (the "project finance" provision, and the approval for a facility "as planned by Buyer" clause) in approximately the same language as appeared in the earlier draft.

The parties do not discuss this draft, however, because of a second event: On that same day, Thermo meets with the New York Department of Environmental Conservation (DEC). DEC makes clear that the construction and air quality permits are *not* transferable or assignable. *See* N.Y.Comp.Codes R. & Regs. tit. 6, § 201.5(c). DEC suggests ways around this problem: It says that, if Thermo simply acquires the Schuyler subsidiary that holds the permits, it will thereby obtain the right to use them without a transfer or assignment.

Following the DEC meeting, a third event occurs: Thermo's representative calls S & S, tells S & S that the condition in paragraph A1 (transfer of the permits) cannot be met, and suggests a way

around the problem, namely that Schuyler would remain a partner in the venture until after construction. Then, when the permits are no longer needed, Thermo would pay Schuyler its share of the purchase price, and Schuyler would drop out of the venture. S & S seems agreeable to this solution; and Thermo says it will put the suggestion in writing in the form of a new draft purchase agreement.

*March 11.* Another company, Montenay, contacts S & S and expresses an interest in buying the project; S & S and Montenay begin to explore a sale to Montenay.

*March 12.* Montenay sends a purchase proposal to S & S.

*March 15.* S & S and Montenay meet and discuss Montenay's proposal. S & S tells Montenay that it plans to sell the project to Thermo, but that if this is not possible, it might sell to Montenay.

*March 17.* S & S writes Thermo a letter in which it points out that a) the DEC permits expire at the end of March and might not be renewed, b) all the Paragraph A "events" had taken place except for the transfer of the permits, the satisfaction of which was "totally within the control of Thermo," c) all Paragraph B "events" had basically taken place but for the letter of credit transfer, and d) the Chemical Bank would transfer the letter of credit if (as Thermo had promised in January) Thermo itself guarantees repayment (instead of insisting that the Bank look only to the project for repayment). S & S's letter adds that "this matter must close and all of the required assignments must be effected by the close of business on March 25, 1986," and, if not, "then the relationship between Thermo and [S & S] with respect to this matter will terminate."

*March 18.* A representative of Thermo telephones S & S, expressing unhappiness with the March 17 letter and suggesting another meeting. S & S says that it has not liked Thermo's proposed changes in the January contract. The S & S representative adds that what is essential is that Thermo "step up and take the project" and assure S & S that it

will take S & S off the Bank's letter of credit. S & S's representative points out that Schiavone had failed to get "project based" financing, and so Thermo will probably fail as well. He says that he knows that "Schiavone could not be taken off the letter of credit by March 31" but he still wants a commitment from Thermo to do so. He also tells Thermo about the prospect of another buyer. The parties arrange for a meeting on March 24.

*March 20.* Thermo sends yet another draft to S & S. To deal with the problem of transferring the permits, this draft keeps Schuyler in the joint venture. It gives Thermo *an option* to buy Schuyler out after one year (paying Schuyler 17.5% of the $1 million purchase price). The draft retains the three objectionable clauses (the option to withdraw by paying (still undetermined) liquidated damages, the "project based financing" clause, and the clause conditioning the sale on construction permits for a "facility as planned by Buyer").

*March 24.* Thermo and S & S meet. S & S tells Thermo about Montenay's interest in purchasing the project, but S & S emphasizes that it still wants to sell to Thermo. S & S stresses that it wants Thermo to make a firm commitment to purchase, including a commitment to buy out Schuyler at the close of construction. Hence, S & S will not agree that Thermo simply have an *option* to buy out Schuyler. (Testimony indicates that the parties agree that Schuyler would also have an option to sell to Thermo.) S & S reiterates that it wants to be taken off the Bank letter of credit. Thermo reiterates that it does not want to pledge its own credit to repay the Bank's letter of credit. At this point, negotiations break down. Thermo's representative, at one point, says "It looks like we're not going to go ahead, so you should go someplace else, and if you can sell the project, sell."

At the close of the meeting, however, Thermo's representative makes a new proposal (conditioned upon approval by higher Thermo authorities). He sug-

gests that Thermo assume Schiavone's bank loan liability, that it spend up to $30,000 to begin token construction work (which would prevent the permits from expiring at the end of March), and that, if it cannot find "project based" financing (and if the parties cannot then sell the project elsewhere), Thermo will share with S & S any losses from abandoning the project.

*A few days after March 24.* Thermo's representative telephones S & S to confirm the proposal with one change: higher authorities at Thermo have decided that Thermo should limit its potential liability from abandonment of the project to $150,000. Within a day or two, however, S & S tells Thermo that it "had decided to sell the project[ ] to Montenay" and that "if the Montenay deal did not go ahead," then S & S "might get back" to Thermo. Thermo's representative replies "that Thermo still wanted to go forward with the deal" and that "S & S was morally and legally tied to Thermo."

*March 31.* S & S carries out sufficient token construction work on the project site to extend the permits.

*April 22.* S & S signs a purchase agreement with Montenay to sell the project for $880,000.

*May 19.* S & S and Montenay close the sale.

B. *Legal Analysis.* As we previously mentioned, these facts clearly show that the parties made a contract in late January and that, at the end of March, S & S broke whatever was left of the contract. The major questions before the trial court were whether or not Thermo, before the end of March, had repudiated the contract, or whether Thermo broke the contract by procrastinating to the point of unreasonable delay.

■ The legal standards are clear. First, *if* Thermo repudiated the contract, its repudiation relieved S & S of its duty to perform. *See Northern Heel Corp. v. Compo Industries, Inc.,* 851 F.2d 456, 471 (1st Cir.1988) (repudiation " 'reliev[es] the [other party] from further performance' ")

(quoting *F.E. Atteaux & Co. v. Mechling Bros. Mfg. Co.,* 245 Mass. 483, 140 N.E. 271, 278 (1923)); *Restatement (Second) of Contracts* § 253 (1981). But Thermo repudiated only if it "insiste[d] ... upon terms," *REA Express, Inc. v. Interway Corp.,* 538 F.2d 953, 955 (2d Cir.1976), contrary to those in the January letter, *to the point where that insistence " 'amounts to a statement of intention not to perform except on conditions which go beyond the contract.' "* *Restatement (Second) of Contracts* § 250 cmt. b, at 273 (quoting U.C.C. § 2-610 cmt. 2) (emphasis added). Commentators have pointed out that there "must be a definite and unequivocal manifestation of intention [not to render performance].... A mere request for a change in the terms or a request for cancellation of the contract is not in itself enough to constitute a repudiation." 4 Arthur L. Corbin, *Corbin on Contracts* § 973, at 905–06 (1951) (footnotes omitted). A party's statements or actions "must be sufficiently positive to be reasonably understood as meaning that the breach will actually occur. A party's expressions of doubt as to its willingness or ability to perform do not constitute a repudiation." E. Allan Farnsworth, *Contracts* § 8.21, at 663 (2d ed. 1990); *accord Restatement (Second) of Contracts* § 250 cmt. b, at 273.

■ Second, Thermo's procrastination or delay in bringing about a closing relieved S & S of its obligation to perform only if the delay itself constituted a repudiation or breach of the contract. *See* 6 Arthur L. Corbin, *Corbin on Contracts* § 1253, at 16 (1962). Since the contract contained no specific time limits, nor any clause stating that time was "of the essence," Thermo had a *"reasonable time"* within which to perform, and what is "reasonable" is a matter for the court to determine on the basis of all the evidence. *Bushkin Associates, Inc. v. Raytheon Co.,* 815 F.2d 142, 146 (1st Cir.1987) ("when a contract is silent as to time, the term shall be a reasonable time based on all the relevant evidence") (citations omitted); *H. Piken & Co. v. Planet Construction Corp.,* 3 Mass. App. 246, 326 N.E.2d 725, 726 (1975)

(same);  *Restatement (Second) of Contracts* § 33 cmt. d.

Given these standards, S & S cannot prevail on this appeal. In our view, the evidence is susceptible of two different and reasonable interpretations. One of them favors S & S; the other does not.

On the one hand, one might read the record as showing "repudiation" or "unreasonable delay." Thermo promised in January to buy the project whether or not it found "project based" financing and whether or not it secured approval for "alternative" technology.. Thermo knew that S & S wanted to sell the project quickly, both because of concerns about the expiration of the permits and because Schiavone wanted to be free of its potential liability under the letter of credit. Thermo also knew that finding "project based" financing would likely prove difficult. Nonetheless, Thermo repeatedly sent S & S drafts that (contrary to the January agreement) would free Thermo from the obligation to buy if it did not find such financing, if it did not secure approval for alternative technology, or if it simply decided it did not want to proceed. Moreover, Thermo would not reaffirm its commitment to go forward. Its claimed justification for delay—S & S's inability to deliver permit transfers—was simply an excuse, for Thermo accepted the solution to the problem, keeping Schuyler in the project until completion of construction. (Indeed, Thermo tried to extract more than its due by taking an "option" to pay Schuyler later, retaining an option of leaving Schuyler in the project and not paying.) Finally, Thermo, while realizing that S & S was under time pressure and needed definite answers, responded to S & S's "demand for closing" letter, with procrastination, reiteration of unacceptable terms, and the flat (March 24) statement that "we're not going to go ahead, so you should go someplace else."

On the other hand, one can reasonably characterize the same record facts differently, and in Thermo's favor. The evidence in the record also supports the conclusion that Thermo intended to live up to the January contract and had no intention to repudiate it; but, in the meantime, it engaged in hard bargaining designed to produce favorable changes. S & S knew (for the January. contract explicitly said) that Thermo wanted to find "project based" financing and that it wanted to explore the use of alternative technology. As S & S and Thermo negotiated over details, Thermo simply tried to obtain changes that would help it on these matters. S & S was free to say "no" (as it did), or to seek compensating changes, such as liquidated damages clauses in return for granting withdrawal options (as some of Thermo's drafts inserted with amounts left blank). Although Thermo must concede that, on March 24, its representative said "go someplace else," he followed that statement, within minutes or hours, with new proposals, efforts to continue negotiations, and statements that a court could reasonably interpret as indicating an intention to proceed, if necessary, as planned.

Although Thermo's actions throughout March caused delay, one need not characterize that delay as beyond a "reasonable time." S & S knew from the beginning that Thermo needed some time to look for "project based" financing. Moreover, S & S's inability to comply literally with the condition concerning transfer of the permits meant that the parties had to spend additional time negotiating the more complicated alternative of keeping Schuyler in the project (which ended up as an alternative in which each party, after construction, had a corresponding option to buy or sell). Further, S & S's ability to extend the permits through token construction, and its May closing date with Montenay, suggest that a closing at the end of March was not absolutely critical. Although S & S wrote Thermo on March 17, explaining that speed was important and insisting upon a closing one week later, S' & S immediately thereafter made statements to Thermo suggesting that a March 25 closing date was less important to S & S than the letter itself suggested. S & S did not consistently indicate that March 25 was the last day that it could reasonably tolerate Thermo's efforts to change, rather than to close, the January deal. Finally, only a few days later, S & S

arranged to sell the project to Montenay despite statements by Thermo that it "still wanted to go forward with the deal," and that "S & S was morally and legally tied to Thermo."

The upshot, in our view, is a classic example of a decision that the law leaves to a district court, not to this court, to decide. The district court, after seeing the witnesses and hearing their stories from beginning to end, found that Thermo did not "repudiate" the contract and that it did not delay the working out of final details beyond a "reasonable time." The basic job of a trial court is to make just such decisions on close questions, where conflicting answers each have strong evidentiary support. We cannot say the district court's conclusions are "clearly erroneous," Fed.R.Civ.P. 52(a), for "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511 (citations omitted).

## IV

### *Damages*

■ The district court, when calculating damages, faced a record with few specific, relevant facts. Thermo presented profit projections suggesting that, had Thermo bought and operated the project, it would have earned between $12 million and $40 million over twenty years. It also presented an agreement between Montenay and another firm, Catalyst Waste-to-Energy Corporation, which showed that Montenay had sold the project to Catalyst only seven months after buying it from S & S for a price equal (in relevant part) to

(i) $2,195,057.85 in cash, representing the amount of Montenay's equity investment in [the project] ... plus any indebtedness of [the project] ... to Montenay ...; and

(ii) a promissory note ... payable to the order of Montenay in the principal amount of $1,850,000, bearing interest. ...

Related testimony indicated that this price was designed to compensate Montenay for what it had invested in the project, includ-

ing its payment to S & S, plus a "profit" or "developer's fee" of $1.85 million.

The district court dismissed the twenty year project profit projections as "speculative." It went on to reason that, if Montenay so quickly earned $1.85 million from its purchase, Thermo could have done the same. And, it awarded Thermo damages of $1.85 million, representing its potential lost profit.

S & S argues that this award was "clearly erroneous," Fed.R.Civ.P. 52(a); *Jay Edwards, Inc. v. New England Toyota Distributor, Inc.*, 708 F.2d 814, 819 (1st Cir.) (deferential review of damage awards), *cert. denied*, 464 U.S. 894, 104 S.Ct. 241, 78 L.Ed.2d 231 (1983), for three reasons. First, it says that Thermo intended to use a different combustion technology, which would likely have proved more expensive. Thermo, however, was only exploring the use of alternative technology. There is no reason to believe Thermo would have used that technology had it seemed likely to generate less profit. "Damages for lost profits need not be proved with mathematical certainty, provided an award has a rational basis in the evidence." *Jay Edwards*, 708 F.2d at 821 (citing *Ford Motor Co. v. Webster's Auto Sales, Inc.*, 361 F.2d 874 (1st Cir.1966)); *see also Wallace Motor Sales, Inc. v. American Motor Sales Corp.*, 780 F.2d 1049, 1062 (1st Cir.1985). And, "where the defendant's wrongdoing created the risk of uncertainty, the defendant cannot complain about imprecision." *Jay Edwards*, 708 F.2d at 821 (citing *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946)); *see also Computer Systems Engineering, Inc. v. Qantel Corp.*, 740 F.2d 59, 67 (1st Cir.1984) (same); *cf. Restatement (Second) of Contracts* § 352 cmt. a, at 145 ("Doubts [concerning calculation of damages] are generally resolved against the party in breach.").

The evidence here suggests that both Montenay and Thermo had roughly similar plans for developing the project. It also shows that Montenay earned its profit in a short time period. Moreover, with one possible exception, *see* p. 1167, *infra*, the evidence offers no convincing reason to be-

lieve that Thermo would have incurred significantly higher costs. Consequently, the award has a rational basis in the record's demonstration of Montenay's $1.85 million profit. *See generally* Robert L. Dunn, *Recovery of Damages for Lost Profits* § 5.1 (3d ed. 1987) (damages must only be established with "reasonable certainty"); *Restatement (Second) of Contracts* § 352 (same).

Second, S & S says that Thermo failed to introduce evidence of Montenay's expenses. It adds that any such expenses should have been deducted from the $1.85 million "developer's fee" that Catalyst paid. The agreement between Montenay and Catalyst and the related testimony, however, adequately support the court's conclusion that the $1.85 million fee represents Montenay "net profit" after expenses. And, the similarities we have noted above suggest similar expenses, while nothing suggests particular differences.

Third, S & S argues that there were particular differences, that the record shows without contradiction that Thermo would have incurred one important, large expense that Montenay did not incur. Thermo would have paid $1 million for the project. The record shows that Montenay paid $880,000 for the project, that is, $120,000 less than Thermo would have paid. The record does not show that any other of Thermo's expenses would have been significantly *less* than those of Montenay. How then could Thermo, which paid, say, $120,000 *more* for the project, have earned the *same* $1.85 million profit through resale unless Catalyst (or some other buyer) had agreed to pay more on resale than Catalyst paid to Montenay? And, what reason is there to believe it would have paid more?

The fact is that there is a good reason to think a buyer would have paid more. The contract between Montenay and Catalyst, quoted above, suggests that the price was geared to Montenay's expenses and investment, plus a $1.85 million *profit*. But, more importantly, the record demonstrates that Montenay did not sell the *entire* project to Catalyst in December. Rather, Montenay retained a valuable right, namely

the right to operate the project itself. The record contains testimony indicating that this right would be worth approximately $300,000 per year to Montenay over the next twenty years. It is reasonable to conclude that such a right, even if the profit prediction is highly speculative, is worth, at least, a one-time payment of $120,000. (In fact, Montenay had obtained that operating right earlier and separately, a fact that may account for the lower price it paid S & S for the remainder of the project.) For this reason, the difference between the project purchase prices of Montenay and Thermo does not legally require the court to abandon its crude valuation rule, namely, if Montenay could make $1.85 million in six months, why could not Thermo do the same? Given the paucity of evidence in the record, legal rules that permit calculations based on rough and ready comparisons, and the absence of evidence that would logically force the court to abandon its valuation assumption, we find the district court's conclusion adequately grounded in the evidence.

The judgment of the district court is

*Affirmed.*

APPENDIX
Cable TEECORP
Telex 92–3411

**Thermo Electron**
**Energy Systems**
101 First Avenue
PO Box 459
Waltham, Massachusetts 02254
(617) 890–8700

January 2[8], 1986

Mr. Joseph Dicarolis
President and CEO
Schiavone Construction Company
1600 Patterson Plank Road
Secaucus, NJ 07094

Mr. Saverio Cappello
President
Schuyler Investments Corp.
744 Broad Street
Newark, NJ 07102

Subject: S & S Incinerator Joint Venture Project—Long Beach, Long Island, NY

Gentlemen:

We are pleased with the results of our investigations to date regarding the subject project. This letter is intended to set forth the basic business terms of an agreement between S & S Incinerator Joint Venture (S & S), Schiavone Construction Company (Schiavone), Schuyler Investments Corp. (Schuyler) and Thermo Electron Energy Systems Division (TEC) or its designee, for the sale of certain rights and assets of S & S (as described herein) to TEC.

TEC has agreed, subject to the conditions set forth herein, to purchase all of S & S's rights, title and interest, including but not limited to all permits, permit applications, licenses, contracts, agreements, leases, engineering, and IDB financing, and the like ("Rights") in and to, or relating to the S & S Incinerator Joint Venture Project at Long Beach, Long Island, NY (the "Project["]). The agreed price is one million dollars ($1,000,000.00) to be paid as follows:

A. One hundred thousand dollars ($100,-000.00) to be paid upon the completion of all of the following events:

1. The assignability of all of S & S's "Rights" has been confirmed to TEC's satisfaction.

2. S & S and the City of Long Beach have executed or will execute on a date agreed by TEC, the Solid Waste Disposal Service Contract with the City of Long Beach, NY with substantially the same terms and conditions as set forth in the draft version provided TEC in December 1985.

3. S & S has provided a copy of the August 14, 1985 Letter Agreement with Baisley Park Carting Co., Inc. which has been executed by Baisley, but has not been executed by S & S. S & S agrees not to execute the Baisley Letter Agreement without TEC's prior approval.

4. The City of Long Beach has executed a "Letter of intent" to S & S describing their (the City) interest in negotiating a contract for the purchase by the City, of the electric power output from the facility, at a 10% discount from their net cost of purchasing the same amount of electric power from Long Island Lighting Company.

5. S & S has provided a copy of the "Partial Payment Affidavit" dated October 4, 1985, executed by Tynan Company Inc. covering work and services provided by Tynan and Dvirka & Bartilucci (engineers) through that date. S & S represents that there are no further outstanding invoices from Tynan or Dvirka & Bartilucci and that to their (S & S) knowledge, no additional work has been performed by either Tynan or Dvirka & Bartilucci since October 4, 1985.

6. S & S has provided TEC with a complete accounting of the project expenditures including the balance of funds available from the IDB financing proceeds. The accounting should clearly identify any and all funds that are expected to be returned to S & S (or its partners) such as unrebated insurance policies, unrebated bid bonds, pre-paid rents, etc.

7. S & S has provided TEC with a letter stating that to the best of their (S & S) knowledge there are no restrictions contained in any of the "Rights" that would prevent TEC from constructing a facility that will process 200 tons per day (7 day basis) with corresponding electric power output, provided the TEC facility does not violate any of the state or federal emission limits. It is understood that TEC is currently exploring other mass burn combustion technologies for use at the facility, and that TEC may not utilize the combustion technology originally contemplated by S & S.

B. Nine hundred thousand dollars ($900,-000.00) to be paid upon completion of all of the following events:

1. The one hundred thousand dollar ($100,000.00) non-refundable payment per A above has been paid.
2. All of the rights have been properly assigned to TEC.
3. A substitute letter of credit has been provided by TEC to replace the Schiavone letter of credit backing the IDB financing.

    In this regard, it is understood that TEC is seeking a substitute letter of credit which will be supported with project credits as opposed to the corporate credit of TEC.
4. All conditions precedent to drawing funds from the IDB construction account have been met.
5. All permits necessary for construction have been issued.

If you agree with the proposal described in this letter, would you kindly sign and return the enclosed copy for our records. Upon your execution, this letter will become a binding agreement between S & S, Schiavone, Schuyler, and TEC with respect to the subject matter hereof. It is understood, however[,] that more complete documentation will be prepared in the future to more fully describe our mutual arrangement.

Very truly yours,
[signed]
Richard L. Hopkins
Vice President
Resource Recovery

Agreed to by:
S & S Incinerator Joint Venture

By: [signed]
for Schiavone Construction Company

by: [signed]
Saverio Cappello
for Schuyler Investments Corp.