**BURLINGTON LANDMARK AS-
SOCIATES, LLC and Bruce
Silverman, Plaintiffs,**

**v.**

**RHI HOLDINGS, INC., Defendant.**

**Civil Action No. 97–12082–MEL.**

United States District Court,
D. Massachusetts.

Nov. 9, 1998.

Paul S. Samson, Reimer & Braunstein, Boston, MA, Kevin Hern, Jr., Riemer & Braunstein, Boston, MA, for Plaintiffs.

John M. Stevens, Foley, Hoag & Eliot, Boston, MA, for RHI Holdings, Inc., defendants.

## MEMORANDUM AND DECISION

LASKER, District Judge.

Bruce Silverman sues RHI Holdings, Inc. for specific performance of a contract for the purchase and sale of a piece of commercial real estate located in Burlington, Massachusetts.[1] Both sides move for summary judgment.

### I.  Facts

On June 16, 1997, Silverman and RHI entered into a written agreement for the purchase of the Burlington property by Silverman for $2.5 million and the assumption of "all liability of the property."

More than a decade earlier, the property had suffered environmental contamination, some of which was determined to have been caused by the industrial operations of an abutting property owner, High Voltage Engineering Corporation. RHI had commenced litigation against High Voltage which was eventually resolved by a settlement providing that High Voltage would clean up the contamination, and RHI would pay one third of the cost of the clean-up in excess of $500,000. By Article VII of the Purchase and Sale Agreement, Silverman assumed RHI's obligations to High Voltage under the Settle-

ment Agreement.  Section 7.3 of that Article reads:

> The provisions of this Article VII shall survive the delivery of the Deed hereunder.  By accepting the Deed hereunder, Purchaser shall be deemed to have acknowledged, agreed, and accepted its obligations under this Article VII, and no further documents shall be required.  From time to time, upon Seller's request, Purchaser shall execute such further documents or instruments or such additional written assurance as may be required or deemed advisable or necessary to evidence Purchaser's obligations under this Article VII.

Under Section 1.9 of the Purchase and Sale Agreement, RHI agreed that, prior to closing, it would make reasonable efforts to obtain High Voltage's consent to the assignment to Silverman of RHI's rights and obligations under the Settlement Agreement. The same section further provided Silverman the express right not to proceed with the purchase in the event High Voltage declined to grant such consent.

Within one month of the signing of the Purchase and Sale Agreement, it became clear to all parties that RHI would have difficulty obtaining High Voltage's consent to the assignment of rights.[2]  RHI and Silverman subsequently agreed in writing to extensions of both the date by which Silverman could elect to bow out of the deal if there was still no consent, and the date of closing. Those dates were finally set at August 8, 1997 and August 15, 1997, respectively, in a joint effort to give RHI more time to obtain the consent.

RHI was represented in its discussions with Silverman about High Voltage and the extensions by an outside consultant named John Jackson.  In the course of setting new dates, Silverman and Jackson discussed various scenarios for proceeding to closing in

---

1.  The property was by agreement to be deeded to Burlington Landmark Associates Limited Partnership, an entity owned and controlled by Silverman which is also a plaintiff in this action. As the Partnership had no independent role with respect to the material facts, the plaintiffs are referred to collectively as "Silverman."

2.  There is no indication that High Voltage opposed the assignment to Silverman of RHI's *obligations* under the agreement.

light of High Voltage's declination to give consent. This litigation flows from those discussions.

Silverman and Jackson envisioned and discussed three different "scenarios" which they came to refer to as "Level 1," "Level 2," and "Level 3." While discussions of the first two "levels" bear no relevance to the present dispute (they are not addressed in the record or on brief), the parties are sharply focused on the substance and significance of the "Level 3" discussion. Jackson and RHI insist that the term referred to the situation in which RHI would be unable to obtain the consent of High Voltage, but Silverman would *unconditionally* waive the requirement of such consent and proceed to closing—in other words, closing the deal based solely on the terms of the written Purchase and Sale Agreement. Silverman, on the other hand contends that it referred to the terms under which he would be willing to close without consent, and that the "Level 3" discussions modified what is undisputedly a "take it or leave it" choice in the written Purchase and Sale Agreement. Specifically, Silverman contends that Jackson, on RHI's behalf, guaranteed, or "assured," the assignability of RHI's rights, and accordingly promised indemnification to plaintiffs should HV ever cease meeting its settlement obligations. It is Silverman's claim to these two "assurances" which resulted in this litigation.

Despite RHI's continued efforts to procure High Voltage's consent to an assignment of RHI's rights under the Settlement Agreement, Jackson eventually advised Silverman that it appeared that consent would not be forthcoming. On August 1, 1997, Jackson faxed Silverman a letter in which he suggested that the parties "proceed to closing on 'Level 3' if necessary," and stated that while he would continue to press High Voltage, he would also "prepare the necessary paperwork to close without . . . consent."

On August 12, 1997, Jackson sent Silverman a letter (referred to by the parties as the "side letter") which, in the words of RHI, "confirmed Silverman's waiver of High Voltage's consent as a condition to closing." It further stated:

in accordance with Section 7.2 of the Purchase and Sale Agreement, at the closing, RHI has assigned to you or your nominee, and you or your nominee has accepted, without the written consent of [High Voltage], and agreed to perform, all of RHI's rights and obligations under the Settlement Agreement. *RHI makes no representation as to the assignability of the Settlement Agreement, including whether [High Voltage] will be required to perform thereunder, post-assignment,* and you acknowledged that non-performance by [High Voltage] shall not relieve you of any obligation under the Purchase and Sale Agreement. . . .

(emphasis added.)

On August 14, 1997, Jackson faxed a letter to Silverman in which Jackson stated that Silverman's right under Section 1.9 to opt out of the purchase was extended to August 27, 1997, and that the closing had been rescheduled for August 29, 1997. Silverman did not agree, and instead wrote back to Jackson that day, stating:

I cannot waive all rights to any "level 3" protection, unless and until we can agree on an alternative. Therefore, the extension date is agreeable,[3] but whatever agreements that are currently in place should remain in place. . . . If we cannot work something out, I am prepared to perform all of my obligations tomorrow morning at Foley, Hoag & Eliot, and expect that you will, too.

On August 15, 1997, Silverman appeared at the time and place set for closing, "ready, willing, and able,"[4] to purchase the property, having already caused the sum of $1,600,000

---

**3.** RHI does not contend that by these words Silverman agreed to the proposed modification of a further time extension; it is undisputed that the closing date remained August 15, 1997.

**4.** Defendant asserts conclusorily that Silverman was not in fact "ready, willing, and able" to close, but has submitted no evidence in support of this contention other than the same "repudia-

tion" evidence discussed below. This evidence simply does not apply to Silverman's readiness or ability to close. There is nothing in the record to throw into question Silverman's readiness or ability, and, indeed, plaintiffs have put forth sufficient, specific evidence on the subject which is discussed below.

to be wired to a bank account designated by counsel for RHI pursuant to written instructions received prior to closing. He began executing the closing documents, including the settlement statement. When RHI attorney Jacob Polatin arrived, Silverman presented to him a letter, signed by Silverman, and requested Polatin's countersignature. The letter stated:

> We hereby accept delivery of the deed, in exchange for the purchase price and the performance of the purchaser's obligations, solely on the condition and expressly reserving and not waiving, the rights of the purchaser to receive the "Level 3" protection.

Polatin refused to countersign the letter.

Silverman then stated to Polatin that in his view he had "received from Jackson [in the 'Level 3' discussions] assurances that were enforceable against RHI and would survive the closing," namely the assurances of assignability and indemnification. Silverman further stated that he was "reserving [his] rights as to 'Level 3' protection." RHI says that Silverman also stated that he would proceed to closing without Polatin's countersignature on the letter Silverman had presented, but that he would do so only "in express reliance on the views expressed in the letter."

In apparent response to Silverman's acts and statements, Polatin then presented a new copy of the "side letter" that had originally been sent to Silverman three days prior. He requested that Silverman sign the letter or provide other assurances of his intention to perform unconditionally RHI's obligations to High Voltage irrespective of whether High Voltage honored the assignment of rights. Silverman refused to sign the letter, and subsequently requested through counsel that the closing proceed regardless. RHI then refused to close, and this law suit resulted.

## II. Analysis

Because the facts of Silverman's conduct at the closing are not in dispute, the case turns solely on whether, as RHI argues, that conduct constituted a repudiation of the Purchase and Sale Agreement.

A repudiation is "a statement by [an] obligor to [an] obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach...." *Restatement (Second) of Contracts* § 250(a) (1981). While an obligor's "mere expression of doubt as to his willingness or ability to perform is not enough to constitute a repudiation," language that is "sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform" is sufficient. *Id.* cmt. b. Moreover, a statement "of intention not to perform except on conditions which go beyond the contract" rises to the same level. *Id.* An act—or series of acts—constitutes a repudiation if it renders the actor's performance "actually or apparently impossible." *Id.* cmt. c. To constitute a repudiation, the statement or act "must be either with respect to the entire performance that was promised or with respect to so material a part of it as to go to the essence [of the contract]. It must involve a total and not merely a partial breach." *Bucciero v. Drinkwater*, 13 Mass. App.Ct. 551, 434 N.E.2d 1315, 1318 (1982) (quoting 4 *Corbin on Contracts* § 975, at 918 (1951)).

RHI contends that Silverman's repeated claims to, and his ultimate "reserving" of terms not included in the written contract did indeed "go to the essence of" the contract, and argues that Silverman's insistence that the contract had been modified in the "Level 3" discussions therefore constituted a repudiation. In particular, RHI emphasizes that the setting of the purchase price for the property had significantly depended upon those parts of the agreement relating to environmental risks and liabilities of the parties.

Silverman counters by denying the significance or "materiality" of the rights which he claimed at the closing, arguing that the essence of the contract is the exchange of the property for the purchase price—$1.5 million in cash and a $1 million promissory note payable by Silverman to RHI. According to Silverman, the rights which he claimed at the closing by way of an allegedly enforceable modification (namely, the right to RHI's guarantee of assignability and the right to indemnification by RHI) were relatively in-

significant, sideline rights which would only ever be at issue in the event High Voltage suddenly quit fulfilling its clean-up obligations. Demonstrating such an event as unlikely, Silverman submits the affidavit of his real estate lawyer, Robert Buckley, explaining that High Voltage is in fact currently cleaning up the property, and doing so under the watchful eye of the Massachusetts Department of Environmental Protection. RHI offers no evidence to the contrary. Silverman notes that any possible disputes over assignability, the claimed guarantee of assignability, or the claimed right of indemnification, would be addressed not in this, but subsequent litigation.

Silverman further points out that one party's good faith disagreement with the other as to contract interpretation, and even one's threat of future litigation related to such disagreement, does not relieve the other of its obligation to perform. Silverman argues that what he ultimately said and did at closing amounted to a statement that although he strongly believed that the parties had agreed to a valid and enforceable contract modification, he was ready and willing to go forward with the closing without RHI's agreement on the matter, and despite RHI's dispute of this point—in essence, he was willing "to take his chances." Silverman is correct.

■ As an initial point, Silverman's characterization of his position at the closing is accurate—he did nothing more than request RHI's acceptance of his position. When RHI refused, Silverman merely advised RHI that while he was nevertheless willing to proceed to closing, he reserved the right, if necessary, to pursue his position at a later date. Such conduct does not constitute repudiation under Massachusetts law.

In *Bucciero v. Drinkwater*, 13 Mass.App. Ct. 551, 434 N.E.2d 1315, 1317–18 (1982), the purchaser and seller of real property disagreed prior to closing as to whether their contract imposed upon the purchaser a duty to pay back taxes on the property. The seller argued that the purchaser's insistence that the contract be interpreted not to impose such a duty was a repudiation, or, alternatively, that it demonstrated that the par-

ties had never had a meeting of the minds. The Appeals Court rejected both contentions, holding that "Bucciero's position ... was not shown to be other than an honest disagreement over the meaning of a clause which, although material, did not go to the essence of the agreement." The decision is instructive in several ways—first, for the proposition that the existence of a good faith dispute is generally no bar to the parties' rights to a consummation of the agreement. In *Bucciero*, the purchaser maintained his position despite a contrary ruling on construction by a court just prior to closing, yet the position was found to be asserted in good faith. *See also Daley v. People's Bldg., Loan and Sav. Assn.*, 178 Mass 13, 18, 59 N.E. 452 (1901) (Holmes, J.) ("A mere refusal to pay money when due, especially a refusal based upon the terms of the contract and in good faith although mistakenly believed to be justified by it, is not a repudiation of the contract. . . ."). As in *Bucciero*, the record here contains no suggestion that Silverman acted in bad faith from the time of the "Level 3" discussions throughout the scheduled closing.

In *Benjamin Foster Co. v. Commonwealth*, 318 Mass. 190, 196, 61 N.E.2d 147 (1945), the Supreme Judicial Court stated that "[t]he fact that an executed written contract contains within itself difficulties of construction about which the parties disagree does not enable a party to contend that the minds never met," and relieve him of his obligations. There appears no reason why an honest dispute over an alleged oral modification to a contract—even one facing a compelling Statute of Frauds defense—should be viewed any differently than disputes such as that in *Benjamin Foster*.

■ Even an *express* threat of litigation over a dispute of construction will not excuse the other party from fulfilling his obligations. *Simpson v. Vasiliou*, 29 Mass.App.Ct. 699, 564 N.E.2d 607, 610 n. 3 (1991). RHI acknowledges this rule, but seems to argue that it should be ignored here because "RHI's position does not rest on a claim that the plaintiffs simply threatened litigation. . . . To the contrary, RHI [behaved at closing as it did] *because of specific past experience with [Silverman]*." RHI Memorandum at 8–

9 (emphasis added). Upon analysis of RHI's extensive and otherwise irrelevant discussion in its papers of a past Silverman–RHI deal gone awry, this position is understood to mean that a threat of litigation by someone who is difficult to work with is somehow exempt from the rule articulated in *Simpson.* The position is unsupported by authority, perhaps because it is not persuasive.

■ As important as the application of the rules stated above is the fact that Silverman's insistence on and "reserving" of the purported additional assurances simply did not go "to the essence of" the Purchase and Sale Agreement. As discussed above, "[i]n order to operate as a discharge of the other party, the [claimed] repudiation must be either with respect to the entire performance that was promised or With respect to so material a part of it as to go to the essence." *Bucciero,* 434 N.E.2d at 1318 (citation omitted). The conduct must involve "a total and not merely a partial breach". *Id.* Silverman's claimed modification did not go to a sufficiently material part of the contract to constitute a repudiation.

The essence of the Purchase and Sale Agreement was the exchange of a parcel of real property for a large sum of cash and debt. RHI has submitted no evidence that the possibility that Silverman will ever get into a dispute with High Voltage over the latter's clean-up is anything but relatively remote. Silverman, on the other hand, has raised through the affidavit of Robert Buckley the undisputed fact that the Massachusetts Department of Environmental Protection is supervising the clean-up— which suggests a greater likelihood of High Voltage's continued performance under the Settlement Agreement. This fact weakens RHI's contention that the parties' respective environmental rights and liabilities were of central import to their bargaining over consideration. Moreover, the Court in *Bucciero* dismissed a dispute over the purchaser's duty to pay $85,000 in back taxes as not going to the essence of the contract, deeming the disputed amount as "relatively insubstantial in comparison to the total contract price, [which was] in excess of $1.6 million." *Id.* In this case, the total con-

tract price was considerably greater ($2.5 million), and there is no indication in the record as to a dollar value of the environmental rights and liabilities that form the backdrop of the litigation.

■ RHI argues further that "language that under a fair reading amounts to a statement of intention not to perform except on conditions going beyond the contract constitutes a repudiation." *See Restatement (Second) of Contracts* § 250, cmt. b (internal notations omitted). *See also Thermo Electron Corp. v. Schiavone Const. Co.,* 958 F.2d 1158, 1164 (1st Cir.1992). That rule, however, is inapplicable, as Silverman simply did not stand up at the closing and refuse to budge. Rather than insisting on the deal proceeding on his terms, he accepted RHI's refusal to sign away its position, and moved on to express that he would indeed go forward with the closing, in essence as planned, "taking his chances" on the disputed modification. Silverman's final position that day was sufficient to dispel any belief by RHI that he "intended not to perform except on conditions which [went] beyond the contract." A mere request for a change in the terms of a contract does not constitute a repudiation. *Id.* Rather, a party's statements or actions must be "definite and unequivocal," and "sufficiently positive" to be reasonably understood to mean that the declarant will actually breach the contract if the conditions he seeks are not met. *Id.* Silverman's conduct made clear that he intended not to breach the contract.

■ Finally, RHI's backup argument— that Silverman's refusal at the closing to sign the "side letter" was in and of itself an express breach of Section 7.3 of the Purchase and Sale Agreement and amounted to a repudiation—is rejected. To remind the reader, Section 7.3 states:

> The provisions of this Article VII shall survive the delivery of the Deed hereunder. By accepting the Deed hereunder, Purchaser shall be deemed to have acknowledged, agreed, and accepted its obligations under this Article VII, and no further documents shall be required. From time to time, upon Seller's request, Purchaser shall execute such further docu-

ments or instruments or such additional written assurance as may be required or deemed advisable or necessary to evidence Purchaser's obligations under this Article VII.

RHI argues that Silverman breached this provision when he refused to sign the letter of disclaimer of the contested rights which RHI's attorney Polatin presented to him at the closing. The argument is without merit.

First, Section 7.3 simply does not, as RHI contends, require that Silverman furnish, *whenever* requested to do so by RHI, a written statement describing his obligations under the contract. While admittedly somewhat ambiguous, the section reads most logically to require such "written assurance" upon RHI's request, only *after* transfer of the property to Silverman. Second, the section requires Silverman to confirm only his *obligations* under the contract—and not his rights or lack thereof.

Finally, and perhaps most significantly, the rules about what constitutes a repudiation apply as fully to Silverman's mere refusal to sign the "side letter" as they do to the collection of conduct and statements discussed above. A repudiation requires conduct with respect to "the essence of" the contract, and "must involve a total and not merely a partial breach." *Bucciero,* 434 N.E.2d at 1318. Even if Section 7.3 were interpreted as RHI urges, it is indisputable that Silverman's refusal to sign would constitute merely a partial, minor breach having nothing to do with the essence of the contract.

### III. Conclusion

Accordingly, the defendant's motion for summary judgment is denied, and summary judgement is awarded to the plaintiff. Specific performance of the defendant's obligations under the written purchase and sale agreement is ordered.

The decision reached here is without prejudice to the position of either party with respect to the purported "Level 3" rights.