**CRELLIN TECHNOLOGIES, INC.,**
Plaintiff, Appellant,

v.

**EQUIPMENTLEASE CORP.,**
Defendant, Appellee.

No. 93–1615.

United States Court of Appeals,
First Circuit.

Heard Nov. 1, 1993.

Decided March 8, 1994.

Jeffrey C. Schreck, with whom Neal J. McNamara and Flanders & Medeiros, Inc. were on brief, Providence, RI, for appellant.

Netti C. Vogel, with whom Vogel, Souls & Woodbine was on brief, Providence, RI, for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

SELYA, Circuit Judge.

This appeal teaches that, just as "negotiations and love songs are often mistaken for one and the same," Paul Simon, *Train in the Distance, on Negotiations and Love Songs* (Warner Bros. Records 1981), so, too, negotiations and binding contracts readily can be confused. The lyrics follow.

## I. BACKGROUND

Plaintiff-appellant Crellin Technologies, Inc. (Cretco), a Rhode Island corporation, sells, rents, services, and provides parts for lift trucks and other materials handling equipment. In 1990, Crellin suffered from a serious cash flow malady. In order to stanch the financial hemorrhaging caused by steep monthly payments to institutional lenders, Richard Crellin, Cretco's chief executive officer and part owner, began exploring various options. Crellin knew that, on occasion, defendant-appellee Equipmentlease Corporation (ELC), a Massachusetts firm, had provided financing for certain of Cretco's customers. Consequently, Crellin sought to interest an ELC representative, Mark Patterson, in structuring a sale and leaseback.[1] Cretco proposed to sell its fleet of lift trucks to ELC and then lease back the fleet, keeping the equipment available for use in the ordinary course of Cretco's business. Cretco planned to apply some or all of the sale proceeds to pay down its institutional debt, thereby easing the cash flow crunch and enhancing the prospect that its principal lender, Old Stone Bank (Old Stone), would provide long-term financing on less onerous terms.

---

1. Patterson, who worked out of ELC's Rhode Island office, was a friend of Richard Crellin's brother, Douglas Crellin, and previously had done business with Cretco.

After reviewing what it thought were Cretco's complete financial statements,[2] ELC agreed that a sale/leaseback transaction might prove feasible. In November of 1990, ELC prepared the paperwork that it needed to start a formal commitment process. But ELC's overtures went unrequited, for Old Stone had not agreed to release its security interest in the fleet. Thus, Cretco refused to sign ELC's documents.

During the period from November 1990 to February 1991, Cretco and ELC maintained an ongoing dialogue. Although Cretco now portrays these communications as reassurances that ELC was committed to a sale and leaseback, the trial court supportably found them to be mere expressions of a continuing mutual interest directed toward finding agreeable terms on which to do a deal of some undetermined magnitude.

In February of 1991, Cretco made its peace with Old Stone and received the long-awaited agreement for release of the bank's security interest. Cretco relayed the good news to ELC on or about March 1, and requested a meeting. On March 11, 1991, Richard Crellin travelled to ELC's Worcester (Massachusetts) office and signed papers prepared by ELC. At the same time, ELC executed subordination and option agreements prepared by Cretco.[3]

The parties dispute the legal significance of these events. In one corner, Cretco contends that, in the March 1 call, Richard Crellin gave the green light to consummating the sale/leaseback contract negotiated between the parties in November 1990—and that he reinforced this clearance by executing the documents proffered to him on March 11. In the opposing corner, ELC contends that neither the March 1 telephone conversation nor the March 11 signing carried any legal weight; the call was purely informational and the documents were designed merely to restart the formal commitment process for a new, albeit resurrected, sale and leaseback. ELC points out that the proffered papers were in different dollar amounts and on different terms than the documents prepared in late 1990, and that, at any rate, it never signed them.

The record is at sixes and sevens regarding the reasons why ELC applied the brakes. Richard Crellin testified that ELC led him to believe that the documents would be signed soon after March 11, and Cretco viewed ELC's failure to do so as a breach of contract. ELC's witnesses told a much different story. They said ELC informed Richard Crellin that, in pursuance of its customary practice, the document package had to be submitted to ELC's funding source, BayBank, for approval before ELC would enter a firm agreement. According to these witnesses, a final set of contract documents ultimately would have been generated if, having been assured that funds were available, management made a binding decision to do the deal.

It is undisputed that ELC approached BayBank to supply the needed funds, and that BayBank turned thumbs down. Thereafter, ELC requested additional information from Cretco and submitted a revised request. BayBank again refused to open the purse strings, reportedly due to Cretco's anemic financial status. It was for this reason, then, that ELC decided not to go forward with a sale and leaseback.

To make a tedious tale tolerably terse, Cretco eventually invited ELC to honor what it perceived as a binding contract. ELC declined the invitation, saying that no contract ever existed. Invoking diversity jurisdiction, 28 U.S.C. § 1332 (1988), Cretco sued ELC in the United States District Court for the District of Rhode Island. It charged, *inter alia*, that ELC ignored a binding obli-

---

**2.** When Cretco submitted financial data to ELC in the fall of 1990, it omitted certain relevant segments of its financial history and projections. The omitted material would have revealed both a lower net worth and a decreased likelihood of future profitability. At trial, the district judge found that this omission came about through inadvertence, not through intentional misrepresentation. Nevertheless, the financial statements, as presented, were both misleading and incomplete.

**3.** Unless and until a sale and leaseback transpired, these two documents were meaningless; neither of them had any independent force.

gation,[4] dishonored the implied covenant of good faith and fair dealing that formed part of the contractual relationship, and violated a Massachusetts unfair trade practices statute by deceptive dealing.

After a bench trial, the district judge found that appellant had not proven any of its three claims. On the breach of contract count, the judge determined that there had been no mutuality of obligation and, therefore, no binding contract. In this vein, he noted, *inter alia,* that Cretco had not purported to make a timely acceptance of ELC's proposal; that, throughout the negotiations, Cretco endeavored to keep any agreement contingent upon its ability to secure new (and more manageable) bank financing; that Cretco could not have sold the fleet without first obtaining Old Stone's consent to the release of its security interest—a consent that did not materialize in 1990; that, before litigation became an option of choice, Cretco had not viewed the November 1990 documents as binding; and that Cretco had shopped around in the ensuing months for a better interest rate. The judge found that ELC, too, had kept its powder dry, for it intended all along—though it had not informed Cretco about this contingency in the fall of 1990—to condition any sale and leaseback upon approval by its own funding source. Hence, since both parties believed the transaction to be contingent upon other occurrences, controllable by them—Cretco, for example, did not have to accede to Old Stone's terms, and, similarly, ELC did not have to accede to the terms demanded by its funding source—mutuality of obligation did not exist.

In a commendable effort to cover the waterfront, the judge identified an alternative ground for dismissing the contract claim. Even if one assumed, for argument's sake, that a contract had been formed and that ELC had broken it, Cretco's first count sought only compensatory damages, not specific performance, and Cretco had not proven that it suffered or sustained any recoverable damages.

Cretco's other two counts fared no better. In regard to good faith and fair dealing, the judge reasoned that, because no enforceable contract existed, there could be no breach of an implied covenant arising out of that non-contract. As to chapter 93A, the judge found that the deceptive practices of which Cretco complained, if they occurred at all, did not occur in the course of trade or commerce, and, therefore, did not transgress the cited statute.

Cretco appeals. We affirm.

## II. THE BREACH OF CONTRACT CLAIM

We divide our discussion of this issue into segments, first addressing choice of law and then confronting the merits of appellant's claim.

### A. *Choice of Law.*

■ It is, of course, a black-letter rule that state substantive law must be applied by a federal court sitting in diversity jurisdiction. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). In determining what state law pertains, the court must employ the choice-of-law framework of the forum state, here, Rhode Island. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 491, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Putnam Resources v. Pateman,* 958 F.2d 448, 464 (1st Cir.1992). Choice-of-law judgments are legal in nature, and courts of appeals exercise plenary oversight in respect thereto. *See Soo Line R.R. Co. v. Overton,* 992 F.2d 640, 643 (7th Cir.1993); *Waggoner v. Snow, Becker, Kroll, Klaris, & Krauss,* 991 F.2d 1501, 1505 (9th Cir.1993); *Putnam Resources,* 958 F.2d at 466. Consequently, a *de novo* standard of review obtains.[5]

---

4. At various times, Cretco has argued either that a bilateral contract underpinned the breach of contract count—ELC made a firm offer in November of 1990 and Cretco accepted the offer at that time, subject to a condition (the procuring of Old Stone's consent) that was fulfilled the following March—or, alternately, that ELC extended a unilateral offer, subject to Cretco's later acceptance. Whichever way the scenario is viewed, the upshot of the litigation remains unaffected.

5. In this case the district court, while leaving spoor for the cognoscenti, made no explicit choice of law. We, therefore, write on a pristine page.

**1. *The Local Landscape.*** Rhode Island law anent contract conflict-of-law principles is sparse and leaves the proper choice-of-law test for contract cases shrouded in uncertainty. In 1969, Rhode Island's highest court made use of the *lex loci contractus* doctrine in such a context. *See Union Sav. Bank v. DeMarco,* 105 R.I. 592, 254 A.2d 81, 83 (1969) (holding a loan granted in Massachusetts to be a Massachusetts contract governed by Massachusetts law). Three years later the court, when asked to endorse the neoteric interest-weighing approach to contract conflict issues as enunciated in the Restatement (Second) of the Conflict of Laws § 188 (1971) (hereinafter "Restatement"), expressly declined to choose between the new and the old choice-of-law rules. *See A.C. Beals Co. v. Rhode Island Hosp.,* 110 R.I. 275, 292 A.2d 865, 871 n. 5 (1972). Two subsequent Rhode Island cases that touch upon the question transmit mixed signals. In *Matarese v. Calise,* 111 R.I. 551, 305 A.2d 112 (1973), a case calling for a choice between local law and the law of a foreign sovereign, the court cited with approval a statement favoring resort to the law of the place of contracting. *See id.* 305 A.2d at 118 n. 4 (dictum; citing Annotation, 72 A.L.R. 250 (1931)). Two decades later, the court indicated a preference for an interest-weighing analysis.[6] *See Gordon v. Clifford Metal Sales Co.,* 602 A.2d 535, 539 (R.I.1992) (dictum; implying approval of rule enunciated in Restatement § 6 for choice of law involving "a simple contracts issue governed by general contract principles").

Federal district courts sitting in Rhode Island have spoken to the issue in differing tones. Some have invoked the law of the place of contracting, *see, e.g., Everett/Charles Contact Prods., Inc. v. Gentec, S.A.R.L.,* 692 F.Supp. 83, 89 (D.R.I.1988); *SW Indus., Inc. v. Aetna Cas. & Sur. Co.,* 653 F.Supp. 631, 639 (D.R.I.1987), and some have invoked the interest-weighing test, *see, e.g., Marshall Contractors, Inc. v. Peerless Ins. Co.,* 827 F.Supp. 91, 94 (D.R.I.1993); *Albany Ins. Co. v. Wisniewski,* 579 F.Supp. 1004, 1013 (D.R.I.1984).

**2. *Discussion.*** We need not attempt to resolve this impasse by venturing an informed prophecy as to which test will emerge triumphant in the Rhode Island courts. Here, providentially, Rhode Island law must prevail under either choice-of-law format.

For purposes of the older "place of contracting" test, the Rhode Island Supreme Court has held that the place of contracting is the place in which the last act that forms the contract is performed. *See Tim Hennigan Co. v. Anthony A. Nunes, Inc.,* 437 A.2d 1355, 1357 (R.I.1981); *A.C. Beals,* 292 A.2d at 870–71. Counsel for Cretco maintained at oral argument in this court that the contract solidified on or about March 1, 1991, when Richard Crellin telephoned ELC to relay the news of Old Stone's agreement to release its security interest. This telephone call originated in Rhode Island. Thus, even though ELC received the call in Massachusetts, the final act of contract formation took place in Rhode Island. The rule is that, when a contract is cinched in the course of an interstate telephone call, the contract will be deemed to have been made in the state where the decisive words were spoken. *See, e.g., Perry v. Mount Hope Iron Co.,* 15 R.I. 380, 5 A. 632, 633 (1886) (holding that an offer accepted by telegraph will be deemed accepted where telegram is sent, not where it is received); *see also* John E. Murray, Jr., *Murray on Contracts* § 47G, at 152 (3d ed. 1990) (explaining proper rule for acceptance of offer by telephone; where parties are at a distance, "acceptance will have occurred where and when the acceptance was spoken or sent"). Hence, under the place of contracting rule, Rhode Island law applies to the breach of contract count.

The functional interest-weighing approach to conflict analysis for contract issues yields the same result. This approach requires a court to take cognizance of overall policy goals even as it evaluates the significance of the parties' contacts with various jurisdictions and their conduct as a contract is negotiated, consummated, and performed. *See* Restatement §§ 6, 188. On the policy side,

---

6. Courts and commentators use a variety of compound adjectives, such as "interest-weighing" and "locus-of-interests," to describe the more modern approach. For ease in reference, we employ the term "interest-weighing."

the Restatement suggests that a court inquiring into choice of law consider (1) the needs of the interstate system; (2) relevant policies of the forum; (3) policies of other affected states and their interest in the outcome of the litigation; (4) protection of the parties' justified expectations; (5) uniformity and predictability of results; and (6) ease in determining and applying different bodies of law, see id. § 6. This panoply of policy considerations is to be assessed against a more traditional, more concrete backdrop comprised of (1) the place of contracting; (2) the situs of negotiations; (3) the place of performance; (4) the location, if any, of the contract's subject matter; and (5) the business locations and states of incorporation of corporate parties, see id. § 188.[7]

Under an interest-weighing analysis, appellant's contract claim is governed by Rhode Island law. Cretco is a Rhode Island corporation. ELC, albeit headquartered in Massachusetts, maintains an office in Providence, Rhode Island. Cretco initiated and continued negotiations with ELC's representative, Mark Patterson, in Providence.[8] Although performance of the sought-after contract would have overspread a wide geographic area, the cash infusion generated by the sale and leaseback was to have taken place in Rhode Island and was to have been used in large part to retire debt owed to a Rhode Island lender. The fleet would continue to be based in Rhode Island and to be monitored by Cretco's Rhode Island headquarters.

In addition, an application of Rhode Island law furthers the general principles and policy goals limned in the Restatement. Rhode Island is the forum state. It has a legitimate stake in the outcome of the suit: Cretco is domiciled in Rhode Island and its economic viability is at risk. This interest clearly outweighs Massachusetts' interest in the suit (which is limited to the impact of one soured relationship between an in-state defendant and one of its many out-of-state clients). The combination of appellant's home base, ELC's presence in Rhode Island, and the incidence of negotiations involving a Rhode Island representative of ELC should have led thoughtful parties to expect that Rhode Island law would govern their dealings. Last, the law of the forum, other things being equal, is ordinarily to be preferred; Rhode Island's is the most natural, and, therefore, the easiest law for the district court to apply. We think it follows that, under an interest-weighing analysis, the substantive law of Rhode Island controls appellant's contract claim.

To recapitulate, regardless whether lex loci contractus or an interest-weighing approach prevails, a Rhode Island court would apply Rhode Island substantive law to appellant's contract claim. Thus, the federal district court, sitting in Rhode Island, was obliged to do the same. In turn, this court must also utilize Rhode Island law—and we must do so without deference to the district court's construction of that law. See Salve Regina Coll. v. Russell, 499 U.S. 225, 230, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

### B. The Merits.

The district judge, sitting without a jury, found that the end product of the negotiations between Cretco and ELC lacked mutuality of obligation, and, consequently, did not achieve the status of a contract. Appellant polemicizes the court's ruling that no enforceable contract existed between the par-

---

**7.** Choice of law in a contract case requires a court to make a threshold determination as to the efficacy of any choice-of-law provision that the parties may have included in the contract documents. Here, the draft lease submitted by ELC to Cretco in November 1990 contained a provision for construction and enforcement according to Massachusetts law. We disregard this provision for three reasons. First, Cretco never signed the document in question, and the provision did not reappear in later documents. Second, neither party mentioned the provision in appellate briefs nor argued that it should be given effect. Third, while section 187 of the Restatement indicates that an effective choice-of-law provision in a contract document generally should be respected, that rule "is applicable only in situations where it is established to the satisfaction of the forum that the parties have chosen the state [to be the source] of the applicable law." Restatement § 187, cmt. a. This is not such a case.

**8.** After the initial discussions, negotiations continued in Rhode Island, Massachusetts, and Connecticut.

ties, claiming that the court grossly undervalued the evidence showing that ELC actively demonstrated its continuing interest in, and commitment to, a sale and leaseback.

**1. *Standard of Review.*** When a case is tried to the bench, we review the trial court's findings of fact with considerable solicitude, disturbing those findings only for mistake of law or clear error. *See Cumpiano v. Banco Santander,* 902 F.2d 148, 152 (1st Cir.1990); *Reliance Steel Prods. Co. v. National Fire Ins. Co.,* 880 F.2d 575, 576 (1st Cir.1989); *see also* Fed.R.Civ.P. 52(a). To be sure, appellant strives to blunt the force of this rule by pointing out that mistakes of state law are subject to plenary review, *see Salve Regina Coll.,* 499 U.S. at 230, 111 S.Ct. at 1221, and then dressing quintessentially factual matters in the garb of "legal error." But factual issues are demonstrably different than legal issues, and no amount of slick costumery can transform the one into the other.

■ We have consistently held that, so long as the evidence does not point unerringly in a single direction but is capable of supporting conflicting inferences, the question of whether a contract has been formed between two parties is a question of fact to be determined by the factfinder. *See, e.g., Bushkin Assocs., Inc. v. Raytheon Co.,* 815 F.2d 142, 145, 151 (1st Cir.1987); *Chedd–Angier Prod. Co. v. Omni Pub'ns Int'l, Ltd.,* 756 F.2d 930, 935 (1st Cir.1985). Here, appellant's argument centers around the issue of contract formation and questions the district court's findings anent mutuality of obligation. These questions are appropriately classified as questions of fact, subject to clear-error review. Within this paradigm, a finding concerning a party's intent to contract is a finding of fact. *See Gel Systems, Inc. v. Hyundai Eng'g & Constr. Co.,* 902 F.2d 1024, 1027 (1st Cir.1990); *Reliance Steel,* 880 F.2d at 576.

■ In reaching this conclusion, we expressly reject appellant's asseveration that the issue of mutuality demands *de novo* review simply because it involves a mixed question of law and fact. While such an issue

does present a "mixed" question, mixed questions, to the extent that they are fact-dominated, are subject to clear-error review, not *de novo* review. *See In re Howard,* 996 F.2d 1320, 1328 (1st Cir.1993); *Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 990 (1st Cir.1990), *cert. denied,* 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991). Therefore, unless appellant can show that the district court incorrectly applied a legal rule or standard—and, here, no such mistake of law looms—the court's findings in regard to mutuality must be upheld so long as they are not clearly erroneous. *See Roland M.,* 910 F.2d at 990; *Thrifty Rent–A–Car Sys., Inc. v. Thrift Cars, Inc.,* 831 F.2d 1177, 1181–82 (1st Cir.1987); *RCI Northeast Servs. Div. v. Boston Edison Co.,* 822 F.2d 199, 202 (1st Cir.1987).

■ **2. *Mutuality of Obligation.*** The law requires mutuality of obligation as a prerequisite to a binding bilateral contract. *See B & D Appraisals v. Gaudette Mach. Movers, Inc.,* 733 F.Supp. 505, 507 (D.R.I. 1990); *Law v. Law Trucking Co.,* 488 A.2d 1225, 1228 (R.I.1985); *see generally* 1 Richard A. Lord, *Williston on Contracts* § 1:17, at 44 (4th ed. 1990). This mutuality can be evidenced by an exchange of promises. *See B & D Appraisals,* 733 F.Supp. at 508; *Judd Realty, Inc. v. Tedesco,* 400 A.2d 952, 956 (R.I.1979); *see generally Murray on Contracts, supra,* § 65, at 269 n. 48.

Appellant argues that this benchmark has been achieved. It seems to be saying that the documents submitted to it by ELC in 1990 embodied an offer, duly accepted by a return promise at the time, subject, however, to a contingency (Old Stone's consent to releasing its security interest); and that removal of the contingency took place on or about March 1, 1991, when appellant informed ELC of Old Stone's acquiescence.[9] But this scenario overlooks—or, at least, impermissibly discounts—the district court's factfinding.

■ To show mutuality of obligation, both parties must have been legally bound

9. From time to time, appellant shifts gears. On those occasions, it seems to be saying that ELC's offer was unilateral and remained open until

March 1, 1991, when appellant accepted the arrangement. We cover this possibility in Part II(B)(3), *infra.*

8

through the making of reciprocal promises. Here, the court thought that both ELC and Cretco intended any agreement to be tentative, ergo, nonbinding, until other things happened. As to ELC, the court found that it intended agreement to await approval by one of its funding sources—an approval that never materialized. This finding is amply supported. After all, ELC never signed the documents it proffered to Cretco in 1990. The next spring, ELC declined to sign the new set of lease documents. At that time, ELC asked for, and Cretco supplied, additional financial information for the sole purpose of attempting to convince BayBank, an ELC funding source, to underwrite the transaction. The record is barren of evidence that ELC received a funding commitment at any time. The record is similarly barren of evidence that ELC did major deals without outside funding. These facts strongly support the district court's finding that ELC did not intend to bind itself through the submission of preliminary transactional paperwork in 1990.

As to Cretco, the court concluded that it, too, lacked the requisite intent to be bound. From its standpoint, entering into a binding contract had to await two developments: the extraction of a piece of paper from Old Stone and, in Judge Torres's words, the obtaining of "satisfactory supplementary financing." We believe that the court's subsidiary findings on these points are sustainable; indeed, it was for these very reasons that Cretco refused to execute the documents tendered to it in 1990.

■ In an effort to undermine the court's determination that it was not bound, appellant argues that its acceptance of the November offer required it to do its utmost to gain the Old Stone release. This argument will not wash. For one thing, it glosses over the parallel, equally lethal finding that appellant viewed any relationship with ELC as subject to the obtaining of supplementary financing (in amounts, and on terms, satisfactory to appellant). For another thing, both parties to a bilateral contract must have made more

than illusory promises for the agreement to be binding. See John D. Calamari & Joseph M. Perillo, Contracts § 4–17, at 160 (2d ed. 1977). It is settled law that, when the promised act is conditional on the occurrence of a future event within the control of the promisor, the promise is illusory. See Vickers Antone v. Vickers, 610 A.2d 120, 123 (R.I. 1992); see also Calamari & Perillo, Contracts § 4–17, at 160. We see nothing in the 1990 "Equipment Lease Agreement" that would indicate that appellant bound itself to have Old Stone release its security interest in the fleet or to make any particular efforts in this regard. Moreover, even if such an obligation can somehow be implied out of thin air—and we do not think it can be—the documents certainly impose no time limit on when appellant would have to bring about this event, or what concessions it would have to endure. Therefore, the procuring of Old Stone's release, like the obtaining of supplementary financing, was in appellant's unbridled discretion. At the most, then, appellant gave ELC a mirage of a promise.

We add that appellant's actions belie its current contention that the parties were bound in 1990 and thereafter. During the critical period, appellant tried valiantly to forge arrangements with other lending institutions—arrangements that would have left ELC out in the cold. Richard Crellin testified that, as late as February of 1991, he approached Fleet Bank to see if it would "offer a more attractive deal." He admitted on cross-examination that he would have looked favorably upon Fleet replacing both ELC and Old Stone in Cretco's plans had an offer been forthcoming on comely terms.[10] Thus, despite the fact that appellant claims it was only scouting out supplemental financing, the evidence is adequate to warrant the district court's contrary finding that appellant continued to seek other financing options as a surrogate for, rather than as a supplement to, an alliance with ELC. When, as in this case, the proof supports more than one plausible view of the relevant events, and the district court chooses one such view over

10. Mark Patterson testified that in early 1991 he believed Cretco was "shopping around" for better financing terms and biding its time in antici-

pation of a lower prime rate. It is obvious from this and other evidence that ELC knew of Cretco's ongoing forays into the financial markets.

another, the court's choice cannot be clearly erroneous. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 457 (1st Cir.1992).

This finding is significant. Although appellant may have exercised good business sense when it shopped the financial markets for better terms in the winter of 1990–91, it cannot plausibly claim that ELC was bound although it had no corresponding obligation. Given, especially, three things—the discretionary nature of appellant's "obligation" to procure the Old Stone release and the needed supplementary financing, its concession that, in and after November of 1990, it believed that "if it had wanted to, it could have gone elsewhere" for financing,[11] and the evidence that it acted on this stated belief—we do not perceive clear error in the district court's finding that no obligation inured on Cretco's part.

To sum up, the trial court found that *neither* ELC nor Cretco undertook a binding obligation to the other. Either half of this disjunctive finding is sufficient to warrant judgment for the defendant on the breach of contract count. Both halves are sustainable. Hence, the court's ultimate conclusion—that no enforceable contract existed because no mutuality of obligation existed—is unimpugnable.[12]

■ 3. *Unilateral Offer.* Before leaving the breach of contract claim, we close one last door. Were we to characterize the initial document submission as a unilateral offer—a characterization that appellant, for the most part, has assiduously resisted—appellant's lot would not be improved. As the district court observed, the documents that ELC delivered in November 1990 did not specify a time within which appellant had to accept any offer they might have contained. It, therefore, would have had a reasonable time within which to do so, for an offer that does not contain a deadline for acceptance will lapse after a reasonable time if it is not accepted. *See Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 853 (1st Cir.1987) ("It is hornbook law that an offeree's power of acceptance vanishes at the time specified in the offer, and if no deadline is prescribed, 'at the end of a reasonable time.'") (quoting Restatement (Second) of Contracts § 41(1) (1979)); *see also Minneapolis & St. Louis Ry. v. Columbus Rolling Mill,* 119 U.S. 149, 151, 7 S.Ct. 168, 169, 30 L.Ed. 376 (1886); *Thermo Electron Corp. v. Schiavone Constr. Co.*, 958 F.2d 1158, 1164 (1st Cir.1992). What amount of time is reasonable within the context of a particular case is "a classic example of a decision that the law leaves to a district court, not to this court, to decide." *Thermo Electron*, 958 F.2d at 1166; *see also Murray on Contracts, supra*, § 41C, at 102.

■ Appellant concedes that, generally, four months is an unreasonably long time for a financing offer to remain open. We agree with the district court that, in a period of rapidly fluctuating interest rates and with no extenuating circumstances, this case falls comfortably within the sweep of that generality. Because it would have been thoroughly unreasonable for appellant to believe that a sale/leaseback proposal made in November and not then accepted would linger on the table until the following March, a "unilateral offer" theory leads down a blind alley. And,

---

11. Appellant's counsel made the quoted statement to the district court in final argument. Appellant, therefore, cannot disclaim the statement on appeal. *See, e.g., United States v. Dietz*, 950 F.2d 50, 55 (1st Cir.1991) (explaining that a party who, in hindsight, finds dissatisfaction with the arguments he advanced in the district court "cannot switch horses mid-stream in hopes of locating a swifter steed"); *see also Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 214 (1st Cir.1987) (stating that when a litigant "asserts inconsistent statements of fact" at different junctures in litigation, the doctrine of "judicial estoppel" prevents unfair advantage).

12. Even if Massachusetts law supplies the rule of decision, the result remains the same. Massachusetts also requires mutuality of obligation as a prerequisite to the formation of a binding contract. *See, e.g., Graphic Arts Finishers, Inc. v. Boston Redev. Auth.*, 357 Mass. 40, 255 N.E.2d 793, 796 (1970); *Gill v. Richmond Co-op Ass'n*, 309 Mass. 73, 34 N.E.2d 509, 513–14 (1941); *see also Eliopoulos v. Makros*, 322 Mass. 485, 77 N.E.2d 777, 779 (1948) (stating that mutuality of obligation is required for a binding contract, although the parties' obligations need not be of equal value).

moreover, we discern no clear error in the trial court's rejection of appellant's claim that the "offer" was periodically refreshed by what appellant—but not the court—viewed as continuing reassurances.

## III. THE IMPLIED COVENANT CLAIM

■ Appellant next claims that ELC breached an implied covenant of good faith and fair dealing when it refused to proceed with the alleged contract, and, adding insult to injury, gave apocryphal reasons for its refusal to perform. When, as now, a duty of good faith and fair dealing is alleged to arise from a contractual relationship, a claim for breach of that duty sounds in contract rather than in tort. *See Bertrand v. Quincy Market Cold Storage & Warehouse Co.*, 728 F.2d 568, 571 (1st Cir.1984). This, in turn, dictates choice of law: the same substantive law that governs the contract claim also governs the implied covenant claim.

■ In this instance, then, Rhode Island law controls. Rhode Island recognizes that virtually every contract contains an implied covenant of good faith and fair dealing between the parties. *See A.A.A. Pool Serv. & Supply, Inc. v. Aetna Cas. & Sur. Co.*, 121 R.I. 96, 395 A.2d 724, 725 (1978); *Ide Farm & Stable, Inc. v. Cardi*, 110 R.I. 735, 297 A.2d 643, 645 (1972); *see also Fleet Nat'l Bank v. Liuzzo*, 766 F.Supp. 61, 67 (D.R.I.1991); *Landry v. Farmer*, 564 F.Supp. 598, 611 (D.R.I.1983). Because the implied covenant exists "so that the contractual objectives may be achieved," *Ide Farm*, 297 A.2d at 645, it necessarily follows that where there is no contract, there is no duty. In such circumstances, there is nothing from which the covenant can be implied. Or, phrased differently, the law does not require persons to act in particular ways in order to achieve illusory contractual objectives.

On this basis, the covenant is left without visible means of support, and no claim for a breach of it will lie. *See Jordan–Milton Mach., Inc. v. F/V Teresa Marie, II*, 978 F.2d 32, 36 (1st Cir.1992); *cf. Gleason v. Merchants Mut. Ins. Co.*, 589 F.Supp. 1474, 1477

(D.R.I.1984) (applying same principle in insurance context).

## IV. THE UNFAIR TRADE PRACTICES CLAIM

We come, finally, to appellant's unfair trade practices claim. This claim invokes a Massachusetts statute that provides in relevant part:

> [A]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice ... may, as hereinafter provided, bring an action ... for damages....

Mass.Gen.L. ch. 93A, § 11 (1984). The district court, without making an explicit choice-of-law determination, dismissed the claim on the ground that the interdicted conduct did not occur in trade or commerce.

Appellant's chapter 93A claim is really two separate but related claims. We deal with them *seriatim*. The first initiative fails to state a cause of action even if chapter 93A applies, and we dispose of it on that basis.[13] The second initiative is a horse of a different hue; if chapter 93A applies, it arguably states a claim. Consequently, we treat the choice-of-law question that necessarily precedes substantive consideration of this initiative.

### A. The First Half of the Chapter 93A Claim.

■ Appellant's initial charge—that ELC, by blaming the collapse of the deal on Cretco's financial plight rather than on its own empty coffers, misrepresented its reason for refusing to proceed with the sale and leaseback—need not detain us. Although Judge Torres found that ELC had not informed appellant that its participation in the deal would hinge upon the availability of funding, there is no credible evidence that ELC ever made express representations to

---

13. Thus, we make no choice-of-law determination as to whether the substantive law of Massachusetts would apply to the conduct underlying this first initiative.

the contrary. Thus, even if we assume the truth of the charge, no reasonable factfinder could conclude that ELC's conduct in this respect descended to the level of rascality required for a successful chapter 93A suit. *See, e.g., Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515–16 (1st Cir.1988) (explaining that, "[i]n Massachusetts, the litmus test for transgression of chapter 93A involves behavior which falls within 'the penumbra of some ... established concept of unfairness'") (quoting Massachusetts cases); *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979) (explaining that "objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce" in order to support a chapter 93A action); *see also Maruho Co. v. Miles, Inc.*, 13 F.3d 6, 10 (1st Cir.1993); *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir.1989); *Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 390 N.E.2d 243, 251 (1979); *Rex Lumber Co. v. Acton Block Co.*, 29 Mass.App. Ct. 510, 562 N.E.2d 845, 850 (1990). Whether or not full disclosure during arm's-length business negotiations is more likely the exception than the rule, a failure fully to disclose, standing alone, while sometimes actionable in tort, ordinarily will not transgress chapter 93A. So it is here.

### B.  *The Second Half of the Chapter 93A Claim.*

The second basis for the appellant's chapter 93A claim arguably consists of sterner stuff. During pretrial discovery, ELC produced a handwritten credit decision memorandum (CDM) dated November 2, 1990. Attached to the CDM was a note purportedly written to Mark Patterson, advising him that the handwritten memo superseded a typed CDM of the same vintage. The difference between the two memoranda is of import. The typed CDM stated that the sale and leaseback had been approved.[14] The handwritten version, however, conditioned the approval on a thoroughgoing review of appellant's financial status and a favorable reac-

tion by an ELC funding source. By the time the case reached trial, appellant had integrated ELC's gamesmanship during discovery with its other purported peccadilloes, and charged that the handwritten CDM was a fake, manufactured after the fact in order to lay the groundwork for ELC's defense.

Even if we assume, *arguendo,* that the described conduct might infract chapter 93A, *see generally Quaker State,* 884 F.2d at 1513–14 (discussing when tactics in, and related to, ongoing litigation may prove actionable under chapter 93A), we nevertheless must pause at the choice-of-law threshold. Recognizing that a defendant in a contract case governed by one state's law nonetheless may be subject to the provisions of another state's unfair trade practices statute, *see, e.g., Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 740 F.2d 59, 64 nn. 6, 7 (1st Cir.1984), that result will obtain only if the forum state's choice-of-law rules so dictate, *see id.* at 70. Considering this possibility brings into play the principle of depecage, which we have described as "the framework under which different issues in a single case ... may be decided according to the substantive law of different states." *Putnam Resources,* 958 F.2d at 465.

For choice-of-law purposes, we treat appellant's chapter 93A initiative as a species of tort claim. At least one federal court has made the across-the-board assessment that chapter 93A claims "should be treated uniformly, rather than on a case-by-case basis, in the same way as tort claims." *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 571 F.Supp. 1365, 1371 (D.Mass.1983), *aff'd,* 740 F.2d 59 (1st Cir.1984). We need not go so far. We hold that, at minimum, when a chapter 93A claim and the requested remedy are highly analogous to a tort claim and remedy, the chapter 93A claim should be considered as a tort for choice-of-law purposes. *See id.* at 1370–71; *see also* Michael C. Gilleran, *The Law of Chapter 93A* § 12:8, at 413 (1989); *cf. Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.*, 986 F.2d 607,

---

14. Although ELC did not produce the typed version in pretrial discovery, appellant knew of its existence through viewing an informal file that

Patterson kept at home. At trial, Patterson testified that he had never seen either the handwritten CDM or the accompanying note.

609 (1st Cir.1993) (holding that a chapter 93A claim may trigger a contractual conflicts analysis where it is essentially an "embroidered" contract claim).

In applying these principles, we focus only on the arguably actionable conduct, *i.e.*, appellant's second chapter 93A initiative.[15] In that initiative, appellant claimed that ELC manufactured evidence in an attempt to justify its nonperformance. This charge resembles the tort of fraudulent misrepresentation. Similarly, appellant asked for a tort-like remedy (multiple damages and attorneys' fees). Thus, we consider this species of chapter 93A claim as falling under the tort rubric for purposes of our choice-of-law assessment.

In tort cases, Rhode Island uses a multipart analysis to determine which of two states has the more significant interest in the resolution of the issue presented in the case. *See Pardey v. Boulevard Billiard Club, Inc.*, 518 A.2d 1349, 1351 (R.I.1986); *accord Brown v. Church of the Holy Name of Jesus*, 105 R.I. 322, 252 A.2d 176, 178 (1969); *Woodward v. Stewart*, 104 R.I. 290, 243 A.2d 917, 923, *cert. dism'd*, 393 U.S. 957, 89 S.Ct. 387, 21 L.Ed.2d 371 (1968); *see also Putnam Resources*, 958 F.2d at 464; *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1092 (1st Cir.1989); *Montaup Elec. Co. v. Ohio Brass Corp.*, 561 F.Supp. 740, 744–45 (D.R.I. 1983).

General choice-of-law principles that should guide a court in making such a determination include (1) predictability of results; (2) maintenance of interstate order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *See Putnam Resources*, 958 F.2d at 464–65; *Brown*, 252 A.2d at 178; *Woodward*, 243 A.2d at 923; *see also* Restatement § 6. In considering these general principles, tort conflict-of-law analysis weighs more heavily the needs of the interstate system, the policies of the interested states as well as the forum, and the ease of determination and application of the law. *See* Restatement

§ 145, cmt. b. In the tort context, these overarching tenets may take into account a number of other factors, including (1) the place of injury; (2) the place where the conduct which caused the injury occurred; (3) the place of incorporation and place of business of each party; and (4) the locus, or center of gravity, of the parties' relationship. *See Putnam Resources*, 958 F.2d at 464; *Fashion House*, 892 F.2d at 1092; *Brown*, 252 A.2d at 179; *see also* Restatement § 145(2).

An application of these factors reveals that Rhode Island has a more significant interest than Massachusetts in the resolution of this claim. Appellant initiated negotiations with ELC in Rhode Island—and interstate policy does not dictate prosecution under the Massachusetts statute of every deceptive trade allegation brought against a company headquartered in Massachusetts but doing business in another state. Rhode Island has a substantial interest in protecting its resident companies from deceptive representations or unfair trade practices, especially those that may occur within its borders. As it is the forum state, an application of Rhode Island's tort law would be more easily accomplished than an application of Massachusetts law.

Then, too, in addition to the Rhode Island locus of the claimed injury, the allegedly tortious conduct also possesses substantial links to Rhode Island. Appellant's claim arose when Douglas Crellin visited Mark Patterson at his Rhode Island home and saw the typed version of the CDM. The coverup itself—if one took place—must have been crafted in the course of pretrial discovery in a Rhode Island forum. Even if we assume that the handwritten version of the CDM was created in Massachusetts—and there is no proof of that fact—such a contact, standing alone, would not be enough to overcome Rhode Island's interest in compensating a Rhode Island company whose financial well-being was compromised through deceptive

15. We express no opinion as to what choice-of-law analysis might have applied to appellant's first chapter 93A initiative, or how the conflicts

issue would have played out, for such matters are beyond the scope of this opinion, *see supra* note 13.

acts of a company doing business within Rhode Island.[16]

■ We conclude, therefore, that to the extent appellant presents a potentially viable unfair trade practices claim, the claim is governed by the substantive law of Rhode Island. Because that is so, appellant's claim under chapter 93A is not actionable.[17] *See, e.g., Eastland Bank v. Massbank for Savings,* 767 F.Supp. 29, 35 (D.R.I.), *aff'd mem.,* 953 F.2d 633 (1st Cir.1991); *cf. Qantel,* 740 F.2d at 70. Accordingly, we affirm the district court's dismissal of this claim on different, but equally dispositive, grounds, *see generally Polyplastics, Inc. v. Transconex, Inc.,* 827 F.2d 859, 860–61 (1st Cir.1987) (explaining that an appellate court, in affirming a judgment, is not limited to the trial court's rationale, but can affirm on any independent ground made manifest in the record), without reaching the question of whether the alleged coverup can be said to have been aimed at influencing Cretco "in the conduct of any [ongoing] trade or commerce." Mass.Gen.L. ch. 93A, § 2.

## V. CONCLUSION

We need go no further.[18] Finding, as we do, that appellant mistook mere negotiations for a binding contract, and that it has no legal recourse against ELC, we uphold the district court's disposition of its suit.

*Affirmed. Costs to appellee.*

16. Although they do not bear repeating, many of the factors that dictate using Rhode Island law vis-a-vis appellant's contract claim, *see supra* pp. 6–7, also militate in favor of using that law vis-a-vis its chapter 93A claim.

17. Appellant has not pointed to a Rhode Island counterpart to chapter 93A, nor has it identified any theory grounded in Rhode Island law under which its unfair trade practices claim might prosper. We, therefore, eschew the temptation to rummage through Rhode Island's jurisprudence. In our estimation, litigants have an independent responsibility to do their homework.

18. Our conclusion that the end product of the parties' negotiations lacked a necessary element of contract formation, *see supra* Part II(B), obviates any need to consider the lower court's alternative holding that the contract claim likewise fails for want of actual damages. Similarly, our conclusion that ELC is not liable in any way eliminates any necessity to determine whether the lower court erred in excluding expert testimony offered by appellant in an effort to prove damages.