**NORTEK, INC., Plaintiff,**

v.

**Sigfried MOLNAR, Defendant.**

No. 98–258L.

United States District Court, D. Rhode Island.

Feb. 22, 1999.

---

John A. Tarantino, Adler, Pollock & Sheehan, Inc., Providence, RI, for plaintiff.

Patrick James Quinlan, Providence, RI, for defendant.

## MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

Of all the lakes in all the states in all the world, Sigfried Molnar had to live near Lake Erie.

Molnar was living near Cleveland when he became senior vice president of Nortek, Inc. in 1990, but he did not move to the company's Providence headquarters. He wanted to live in Grand Island, New York, a suburb of Buffalo just north of the same Great Lake that had lapped near his home in Ohio.

Molnar's apparent affinity for the Lake is central to this case because this Court works in accordance with the dictates of another Erie, namely the choice of law doctrine in *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In March 1998, Nortek fired Molnar, and the parties cannot agree what state's law should control the terms of his employment contract—New York or Rhode Island. Whether or not the parties negotiated that Molnar would move to Grand Island is a key dispute as they contest whether Molnar deserves severance pay and what court should hear that issue.

Nortek filed this action in Rhode Island state court. Molnar removed it to this District Court and filed his own lawsuit in New York state court. That has been removed to the District Court for the Western District of New York. This case is here on Molnar's

motion to dismiss under Fed.R.Civ.P. 12(b)(6). The motion is mischaracterized. (*See* Section II.) In fact, Molnar asks this Court to decline jurisdiction or to stay action on Nortek's request for declaratory relief in preference to the New York litigation.

As discussed below, Molnar's motion is granted. This Court dismisses this case and defers to the ongoing litigation in the Western District of New York. As a preliminary question necessary to that decision, this Court applies Rhode Island's choice of law doctrine and concludes that New York's law controls this controversy between Nortek and Molnar.

## I. *Facts*

In the last months of 1989, Nortek chairman Ralph Papitto recruited Sigfried Molnar to run a division of the company. At the time, Molnar lived in Chesterland, Ohio near Cleveland. In late November or December 1989, the men met in Pittsburgh and in Providence. On December 26, 1989, Papitto sent a letter to Molnar offering him the position of Senior Vice President—Group Operations, accompanied by a sheet outlining some terms of the job ("the Term Sheet").

In mid-January, Papitto and Molnar spoke on the telephone. Papitto was in Rhode Island. Molnar was in Ohio. The two negotiated alterations to the Term Sheet. Molnar says that he proposed and Papitto agreed to seven modifications or clarifications, including a change to the terms of the severance pay provision and the inclusion of $6,000 to $7,000 in moving expenses to Grand Island, New York. Papitto says that Molnar proposed and Papitto agreed to pay an additional $5,000 for income tax preparation fees. Papitto says that Molnar's move to New York was not discussed. The exact offer and acceptance is discussed below in Section III(B)(1). At the end of the conversation, the gentlemen agreed to terms, and Molnar joined the company on March 1, 1990 to run subsidiaries including the Universal–Rundle Group ("URC") based in Pennsylvania.

What began as a beautiful friendship collapsed eight years later when Molnar was fired. As Senior Vice President, Molnar traveled heavily for Nortek. He says he worked three to four days a week from home, until June 1991 in Chesterland and after June 1991 in Grand Island. He also traveled to Nortek's main office in Providence, to URC's headquarters in New Castle, Pennsylvania and to various other URC and customer offices throughout the country. However, Nortek decided in 1998 to eliminate Molnar's job.

The underlying dispute is whether Nortek owes Molnar severance pay and, if so, how much. That will probably turn on the terms of the employment contract. There are two versions of the Term Sheet, the typed original retained by Papitto and a copy annotated by Molnar during his phone conversation with Papitto. Molnar altered the severance pay language, and there is a dispute whether that alteration reflected the oral agreement between Molnar and Papitto.

On March 3, 1998, Nortek's general counsel Kevin Donnelly wrote Molnar with an offer from Nortek to settle the severance pay claim. That offer stipulated that it would be withdrawn if not accepted and returned with a general release and waiver on or before March 30, 1998. As the end of the month approached, Donnelly tried to reach Molar by telephone.

In response to that offer, Donnelly received a phone call on or about March 25, 1998 from Buffalo attorney Gregory Photiadis, who represented Molnar. The two lawyers disagreed in their interpretation of Molnar's employment contract and on the question of whether New York law applies to this case. Donnelly says that he asked Photiadis to send him case law and statutes that they had discussed. But he says that he did not advise Photiadis that Nortek would hold off filing suit or tell Photiadis that Molnar should postpone filing his complaint. Photiadis says Donnelly wanted to discuss the issue with Nortek's current chairman and promised to call Photiadis back.

The lawyers spoke again on April 1, 1998. Photiadis says Donnelly asked him to send a letter outlining his legal reasoning that New York law applied, including New York cases. Photiadis says Donnelly said that after re-

ceiving the letter, he would talk to Nortek's chairman again to discuss a possible resolution. Photiadis says he promised to fax the letter on April 3, 1998, and Donnelly said he would get back to Photiadis afterwards.

Photiadis did fax the letter. Donnelly did not get back to him. Instead, Nortek filed this declaratory judgment action against Molnar on the next business day, April 6, 1998. Molnar responded with a parallel suit in state court in New York that has been removed to the Western District of New York, *Molnar v. Nortek, Inc.*, CA98/0341. The parties disagree about which court should resolve their differences.

## II. *A Framework for this Dispute*

The parties agree on a surprisingly tiny slice of this dispute. They disagree on whether Fed.R.Civ.P. 12(b)(6) applies. They champion different standards for whether this Court should dismiss the case. They differ on what state's law applies to the case. To slice the Gordian pleadings, this Court begins by outlining the issues and a procedure for solving them.

Preliminarily, this is not a Motion to Dismiss under Fed.R.Civ.P. 12(b)(6). Molnar aims that rule at Nortek in its plea, but that is the company's least vulnerable spot. Nortek certainly has stated a claim upon which relief can be granted. Instead, Molnar's motion should be characterized as a request that this Court refuse to exercise jurisdiction over Nortek's declaratory judgment action or stay the action in preference to the New York litigation. This Court has that discretion.

First, this Court will decide what state's law applies to this case. This issue affects the tests that guide this Court's use of its discretion in deciding the "balance of convenience" and "special circumstances." Then, this Court will resolve whether it should hear this case or dismiss in favor of the New York action.

## III. *Choice of Law*

■ This Court, sitting in diversity jurisdiction, must apply Rhode Island's choice-of-law rules. *See Erie R.R.*, 304 U.S. at 78, 58 S.Ct. 817; *Spurlin v. Merchants Ins. Co.*, 57 F.3d 9, 10 (1st Cir.1995); *Crellin Technologies Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 4 (1st Cir.1994). This state has not made this a simple proposition because it has not settled on a single standard. Therefore, this Court will outline the law under both possible regimes.

### A. *The Rhode Island Law*

Rhode Island has not explicitly decided whether contract cases will be governed by a "place of the contract" or an "interest-weighing" analysis. *See Crellin*, 18 F.3d at 5 (collecting state cases); *URI Cogeneration Partners, L.P. v. Board of Governors For Higher Education*, 915 F.Supp. 1267, 1279–80 (D.R.I.1996).

### 1. *Place of the Contract Analysis*

■ "The rule is well settled that a contract is deemed made at the place where acceptance of the offer took place." *Tim Hennigan Co. Inc. v. Anthony A. Nunes, Inc.*, 437 A.2d 1355, 1357 (R.I.1981). In a case where the contract was formed over the telephone, the place of contracting is where the last act that forms the contract is performed. *See Crellin*, 18 F.3d at 5. The Rhode Island Supreme Court has stated one caveat to the general rule where the contract was made in one location and intended to be performed in another:

> It is a fundamental principle of conflict of laws that contracts are to be governed by the laws of the state or country in which they are made, unless made with a view to performance in another state or country, in which case they will be governed by the law of such state or country. This principle is as applicable to contracts of interstate or international carriage as to any other type of contract.

*See Matarese v. Calise*, 111 R.I. 551, 305 A.2d 112, 118 n. 4 (1973) (quoting 72 A.L.R. 250 (1931)) (this writer was the trial judge in that case).

### 2. *Interest Weighing Analysis*

In weighing the interest of several states, this Court must make a series of factual determinations and must evaluate several policy considerations. The factual decisions

are 1) place of contracting; 2) situs of negotiations; 3) place of performance; 4) location of contract subject matter, if any; and 5) parties' business locations and states of incorporation. *See Crellin,* 18 F.3d at 6. The policy considerations include 1) needs of the interstate system; 2) relevant policies of the forum; 3) policies of the other affected states and their interest in the outcome of the litigation; 4) protection of the parties' justified expectations; 5) uniformity and predictability of results; and 6) ease in determining and applying different bodies of law. *See id.* at 5–6.

### B. *Applied to this Case*

■ As explained below, this Court concludes that Rhode Island choice of law doctrine dictates that New York law apply to the employment contract. Because this Court subsequently dismisses the action, its decision does not bind the District Court for the Western District of New York, which under *Erie* looks to New York's choice of law doctrine. The parties, having played out their arguments for this Court, may play them out again for the New York trial judge.

### 1. *Molnar negotiated to work from New York*

The key to the "place of the contract" analysis is whether or not Molnar and Papitto intended for Molnar to perform the contract in New York. As the contract was being negotiated, did they contemplate that Molnar would move to New York and be a New York employee for the company? Molnar says that he made that a condition of the contract and that he intended to move in 1992 after his son graduated from high school. Nortek says the move was not considered.

The intended location of performance is important because it is clear that the contract was made in Rhode Island. The parties agree that Molnar did not accept the Term Sheet mailed to him. Instead, he altered the terms—in a minor way under Papitto's recollection and more substantially under Molnar's. Regardless, that changed the roles in the contract creation. Papitto made the first offer, Molnar made a counter-offer, then Papitto accepted. There is no dispute

that Papitto accepted in Rhode Island, and under *Crellin,* his action created the contract.

However, there is still the issue of *Matarese* and whether the parties intended this contract to be performed in another state. As Molnar negotiated with Papitto on the telephone, he made several telling annotations to his copy of the Term Sheet. At the bottom, he wrote a list of changes to several of the items under the heading "Amended January 19, 1991, per phone conv. with Ralph." The two keys are Items 10 and 11. In the typed original, they read:

10. The company will pay moving expenses should they be incurred.

11. The company will pay for the cost of three trips for you and your wife to visit the area to locate a home, should it be necessary.

In Molnar's handwritten annotations, he wrote:

10. Moving Expenses to G.I.N.Y. Not to Exceed About $6 to $7000.

11. Not needed.

(*See* Exhibit A attached to Aff. of Siegfried Molnar at 3.) These notations are crucial because they are contemporaneous evidence of the parties' agreement. Molnar noted not only that Nortek would move him to "G.I.N.Y." or Grand Island, New York, but he also noted that the company would not have to pay for the cost of house-hunting. He did not need the house-hunt because he knew the area where his wife's family owned property. He was not agreeing to move to just any city; he had chosen Grand Island and made the deal explicit.

The evidence supports the finding that Molnar negotiated his contract in a way that he and Nortek intended for him to move to Grand Island, New York. The one-year delay in his move is consistent with his contention that he delayed the move until his son's high school graduation in June 1992. In short, the parties contemplated that Molnar would perform his contract in and from New York.

Therefore, under the "place of the contract" analysis, this Court would apply New York law to resolve this dispute.

2. *New York has a greater interest in this case*

This Court makes the required factual findings under *Crellin:*

- the contract was made in Rhode Island
- the contract was negotiated in Pennsylvania, Rhode Island and Ohio.
- the contract was performed primarily in New York and Pennsylvania with some performance in Ohio, Rhode Island and other states. The subject matter of the contract was the performance in those states.
- Nortek is a Delaware corporation with headquarters in Rhode Island and had at least one relevant business location in Pennsylvania.

Similarly, this Court weighs all six of the *Crellin* policy considerations.

The first and sixth considerations carry the least consequence. The interstate system will survive no matter what state's laws control this contract, and New York and Rhode Island laws are equally easy to determine and apply. Despite Nortek's suggestion, this Court cannot decide to apply Rhode Island law in this case because the law of the forum should prevail. This Court has not yet decided whether the case should be heard in Rhode Island or New York. Generally, the states have statutes and mature case law that would apply to employment contracts, and in this specific case, either New York or Rhode Island law could be applied to both parties because they each have minimum contacts with both states.

As to the fourth consideration, Nortek misplaces its support on the contention that reasonable parties would expect Rhode Island law to apply. That does not seem to be true either under an objective test or under a subjective test based on the intention of these parties. Objectively, this is an employment contract between a Delaware corporation headquartered in Rhode Island and an employee who lived in Ohio and New York and worked in New York, Pennsylvania,

Ohio, Illinois, Rhode Island and other states. The entire body of choice of law doctrine exists because it is not inherently obvious what state's law should control this kind of complex issue. It would be a legal fiction to claim that a reasonable person could discern the outcome.

Similarly, there is no credible evidence that either party had subjective expectations about choice of law issues. Molnar now argues that he always intended to be a New York employee, and Nortek says Papitto intended for Rhode Island law to govern. They both claim to be shocked, shocked that the issue is left to this Court's equitable decision. But in fact, neither party—despite their sophistication—inserted the choice of law or choice of forum clauses that would have settled the issue. The parties negotiated everything from the substantial $200,000 annual salary to the mundane moving expenses and tax-preparation bills. Their silence on the choice of law speaks clearly about their expectations during the negotiations, and the fact that neither party ever reduced this complex deal to a single, signed writing suggests no one worried about the choice of law issue.

The pith of the states' interests analysis is in the relevant policies of the forums and in the uniformity and predictability of the results. This Court has found that Molnar worked in New York. The parties intended for him to work from his home when they negotiated, and they knew he would move to Grand Island.[1] The wage provisions of the New York Labor Law reflect a strong legislative policy aimed to provide greater than ordinary protection to New York employees. *See, e.g., Pashaian v. Eccelston Properties, Ltd.,* 1993 WL 322835, *2 (S.D.N.Y.1993); *P & L Group, Inc. v. Garfinkel,* 150 A.D.2d 663, 664, 541 N.Y.S.2d 535, 537 (N.Y.App.Div. 1989); *Saunders v. Big Brothers Inc.,* 115 Misc.2d 845, 848, 454 N.Y.S.2d 787, 790 (Civ. Ct.1982). Nortek cites New York case law to the effect that Molnar is not protected by that law because he was an "executive" and

---

1. This Court emphasizes that the parties expected Molnar to move to New York. Despite Nortek's claim, this analysis would not result in an "ever-changing body of governing law that would fortuitously depend upon his residence *du jour*" because if Molnar had decamped for another state, then this factor would not be in play.

not a covered "employee" under the Act. However, this Court does not need to settle the issue on the merits at this time. Molnar's claim under the New York Labor Law makes that law's policy basis relevant in this analysis. Nortek has not suggested and this Court cannot find any similar relevant policy in Rhode Island law.

No single factor controls this decision. In fact, this Court is struck by the truly interstate quality of the contract—that it was negotiated in multiple states, performed in multiple states and made between parties with multiple state loyalties.[2] The *Crellin* test is an amorphous yardstick rather than a straight-edged test. If the parties are frustrated by its equitable nature, then this Court will note again that either party could have avoided this uncertainty. Choice of law and choice of forum clauses are common and enforceable. *See, e.g., M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 1913, 32 L.Ed.2d 513 (1972) (choice of forum clauses). Both parties were sophisticated actors negotiating over hundreds of thousands of dollars, and they took the time to hammer out issues such as life insurance and "shark repellent." A few more strokes of the pen would have avoided this dispute entirely.

Based on a careful weighing of all the factual and policy considerations, this Court concludes that the "interest weighing" analysis dictates the application of New York law.

### IV. Discretion to Hear Declaratory Judgments

█ The Declaratory Judgment Act confers a discretion on the courts rather than an absolute right upon the litigants, so courts have broad discretion to decline to hear or enter a declaratory judgment. *See DeNovellis v. Shalala,* 124 F.3d 298, 313 (1st Cir. 1997) (citing *Wilton v. Seven Falls Co.,* 515 U.S. 277, 287, 115 S.Ct. 2137, 2142–43, 132 L.Ed.2d 214 (1995)). "By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants. Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, ... to dismiss an action seeking a declaratory judgment before trial." *Id.* (citing *Wilton,* 515 U.S. at 288, 115 S.Ct. at 2143). Although federal courts have a virtually unflagging obligation to exercise their jurisdiction, a district court may abstain in "exceptional circumstances." *See id.* (citing *Wilton,* 515 U.S. at 284, 115 S.Ct. at 2141). "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.*

### A. The Standard to Applying Discretion

[7] Where two suits involve the same issues and truly create duplicate litigation, the first-filed suit is generally preferred. *See TPM Holdings, Inc. v. Intra-Gold Industries, Inc.,* 91 F.3d 1, 4 (1st Cir.1996); *SW Industries, Inc. v. Aetna Cas. & Sur. Co.,* 653 F.Supp. 631, 634 (D.R.I.1987). "While the first-filed rule may ordinarily be a prudent one, it is so only because it is sometimes more important that there be a rule than that the rule be particularly sound." *Codex Corp. v. Milgo Electronic Corp.,* 553 F.2d 735, 737 (1st Cir.1977). *See also Davox Corp. v. Digital Systems Int'l, Inc.,* 846 F.Supp. 144, 147 (D.Mass.1993); *SW Indus.,* 653 F.Supp. at 634.

This is an equitable decision made at the discretion of this Court. *See Davox,* 846 F.Supp. at 147. Senior Judge Raymond Pettine oulined two long-accepted exceptions to the first-filed rule in *SW Indus.:*

> [T]he forum where an action is first filed is given priority over subsequent actions, unless there is 'a showing of balance of convenience in favor of the second action' or

---

**2.** Both parties are sophisticated and wealthy enough to litigate in either forum. Despite Molnar's bleating about poverty and Nortek's enumeration of possible documents and witnesses, this is a dispute between an executive who earned hundreds of thousands of dollars a year and a company that earns millions. Regardless of the court venue, depositions will need to be taken in New York and Rhode Island, and documents will need to be exchanged between Buffalo and Providence. There is no forum non conveniens problem in this matter.

there are special circumstances which justify giving priority to the second.

*SW Indus.*, 653 F.Supp. at 634 (citations omitted). Molnar concentrates on the second exception: special circumstances.

Molnar cites to rather-aged Second Circuit law that special circumstances exist where forum shopping alone motivated the party to file the declaratory action. *See William Gluckin & Co. v. International Playtex Corp.*, 407 F.2d 177, 178 (2d Cir.1969). The parties also recognize District Judge Mark Wolf's *Davox* and *Biogen* opinions that looked to promote "the sound policy of promoting extrajudicial dispute resolution" *Davox*, 846 F.Supp. at 148. *See also Biogen, Inc. v. Schering AG*, 954 F.Supp. 391, 397–99 (D.Mass.1996).

Although Senior Judge Pettine was considering the "balance of convenience" test when he weighed the plaintiff's choice of forum, the convenience of the parties, the convenience of the witnesses, the location of relevant documents and the court's familiarity with applicable state law, *see SW Indus.*, 653 F.Supp. at 637–39, it is not clear that the two tests are mutually exclusive. Judge Wolf weighed both the convenience to the parties and the promotion of negotiated settlements in *Biogen. See Biogen, Inc.*, 954 F.Supp. at 397–99. The First Circuit has not required a specific definition for "exceptional circumstances" or "special circumstances."

As such, this Court looks broadly to whether this case is one of the "special circumstances" that merits its discretion to decline declaratory judgment.

### B. *Applied to this Case*

■ Molnar says this case "could not illustrate a clearer instance of forum shopping, as well as bad faith and an improper use of the declaratory judgment remedy." (*See* D.'s Reply Mem. Of Law at 3.) That is unnecessary hyperbole, but the accusations do add up to more than a hill of beans. Donnelly did ask Photiadis to write the April 3, 1998 letter outlining New York legal authority. Photiadis says Donnelly promised to call back after speaking to Nortek's current chairman. Donnelly says he never promised to hold off filing a declaratory action.

This Court would not sanction Donnelly under Fed.R.Civ.P. 11, but he certainly shopped for a forum. Donnelly argues that he was protecting Nortek's rights, but the only "rights" involved were the practical advantages of litigating in Rhode Island. This is not a patent dispute where a manufacturer files a declaratory judgment action against a patent holder because even a doubt over its right to produce a product can damage the product's value. *See EMC Corp. v. Norand Corp.*, 89 F.3d 807, 809–11 (Fed.Cir.1996) (outlining test for whether a patent dispute rises to the level of an "actual controversy"). Nortek had a discrete contract dispute with Molnar. The outcome would not affect Nortek's relationship with other employees or third parties. There was no time-sensitivity, and Nortek would lose no rights if it waited for Molnar to file suit. Obviously, Donnelly acted because Rhode Island would be more convenient or because he thought a Rhode Island court would be more likely to apply Rhode Island law. Those may be realities of litigation, but they are not the reasons why Congress provided for declaratory judgment actions.

Donnelly shopped for a forum, and he bought himself time by asking Photiadis to send him the April 3, 1998 letter. Whether or not Donnelly explicitly promised to hold off filing a declaratory judgment action is immaterial. Photiadis reasonably held off filing suit in New York because he thought the parties were still negotiating. Where this Court has discretion, it will not reward conduct that undermines the sound policy of promoting settlements and negotiations outside the courthouse. *See Davox*, 846 F.Supp. at 148. One would expect that after negotiations broke down, Molnar would file this case in Buffalo. This case should be decided by applying New York law. Therefore, it should be decided in the Western District of New York.

Therefore, this Court finds sufficient special circumstances that convince it to disregard the first-filed rule and thus decline jurisdiction over this declaratory judgment action.

## CONCLUSION

For the preceding reasons, Molnar's motion to dismiss is granted. Dismissal, rather than transfer or stay, is the correct remedy because keeping this action active merely duplicates litigation expenses. Molnar and Nortek are parties to the case in the Western District of New York which presents all the issues that need to be resolved. The parties can shuffle off to Buffalo to get their differences settled.

It is so Ordered.